### In re Grievance of Edward Lynn Goddard

[457 A.2d 637]

No. 426-81

Present: Billings, Underwood and Hill, JJ., and Daley, J. (Ret.), and Costello, Dist. J., Specially Assigned

Opinion Filed February 7, 1983

*Michael R. Zimmerman*, Montpelier, for Plaintiff-Appellee.

*John J. Easton, Jr.*, Attorney General, and *Marilyn Skoglund* and *J. Scott Cameron*, Assistant Attorneys General, Montpelier, for Defendant-Appellant.

**Billings, J.** This case concerns the dismissal of the grievant, Edward Lynn Goddard, from his position as Correctional Shift Supervisor with the Vermont Department of Corrections. In July of 1980, the State dismissed the grievant for unnecessarily beating and striking a resident inmate under his care, and further for failing to report the incident to his supervisors, all in violation of the Department's stated policies and regulations. After a grievance hearing pursuant to 3 V.S.A. § 926, the Vermont Labor Relations Board found that although the bulk of the State's allegations were true, nevertheless there was no "just cause" for dismissal. Pursuant to 3 V.S.A. § 1003, the State appeals the Board's order, which sets aside grievant's discharge and provides for his reinstatement, with back pay, to a demoted position as correctional officer within the same facility. Specifically, the State argues that the Board erred in failing to conclude that the grievant was dismissed for just cause.

The facts in this case, as found by the Board and as admitted by grievant in his testimony, are uncontroverted. Grievant, employed by the Corrections Department since 1976, had been working in the Chittenden Community Correctional Center in South Burlington since 1978. His annual employment evaluations revealed consistent ratings of satisfactory and, occasionally, more than satisfactory performance. Over the years, he had been promoted from Correctional Officer (pay scale 8), to Correctional Foreman A (pay scale 10), and finally to Correctional Shift Supervisor (also pay scale 10), which position he occupied until his dismissal in 1980. In June

of 1980, grievant was assigned as supervisor of the night-shift at the South Burlington facility. During the hours of this shift, 11:30 p.m. to 7:30 a.m., the supervisor was the most senior staff member present. Among other duties, he was to "insure that all security and custodial functions [were] enforced," and to "report any unusual incidents to the proper authority and complete a written report following his tour of duty."

Almost immediately upon his arrival at the facility on the night of June 6, 1980, grievant was informed by the supervisor of the previous shift that there had been "trouble": one inmate had been assaulted by another and was requesting safe placement in protective custody. Grievant questioned the assaulted man to determine his attacker, and discovered that it was an inmate known to grievant as a "violent trouble-maker." He therefore determined to move the latter inmate from the medium security area, known as "MA," to the maximum security area, known as "Special Adjustment," or "SA." It was standard procedure at the facility to move an inmate to "SA" when he became a danger to the safety of the other prisoners.

Grievant knew that the proper method for moving an inmate was to (a) make a "show of force" by using several officers for the move, (b) carry and, if necessary, use "restraints" (such as handcuffs, leg irons and the like), and (c) plan ahead to avoid trouble. But by his own testimony grievant was "angry" at the inmate, and wanted to conduct the move "alone." He therefore declined to obtain either the aid of other correctional officers or the requisite "restraints," although both were readily available for the move. Nevertheless, several of the officers decided to follow grievant as he proceeded towards the inmate's quarters.

Grievant entered the inmate's room alone, and told the inmate he was taking him to SA "for assault." The inmate refused to leave his cell, so grievant grabbed him by the back of the neck and shoved him through the door. Out in the hall, the inmate swung around to face grievant, whereupon grievant pushed him against the corridor wall and delivered six to eight sharp blows to his arms and shoulders. Reacting to the blows, the inmate "covered up" his head area with raised arms. One of the observing officers took hold of the inmate

in order to prevent what he expected to be a retaliatory attack. However, neither at this time nor at any subsequent time did the inmate attempt to punch, strike, swing at or otherwise retaliate against grievant or anyone else.

Grievant then took hold of the inmate by the back of his neck and, with the other officers following behind, shoved and pushed his prisoner down the corridor. The inmate stiffened his legs and refused to walk voluntarily, all the while uttering a steady stream of "jailhouse profanity." Only a few feet down the corridor, grievant again pushed the inmate against the wall, and again struck him about the arms and shoulders. Again, the inmate "covered up" in self-defense, but did not attempt to retaliate. Grievant ceased his battering after several seconds, and continued to push the inmate down the corridor. The inmate continued to balk and to use loud, abusive language. Shortly thereafter, grievant thrust his charge against the wall for a third time, and beat him in the same manner and under the same conditions as previously. Further down the corridor, grievant repeated his assaultive behavior yet a fourth time. Following this fourth beating, however, one of the observing officers joined grievant in taking hold of the inmate, and together they escorted him the rest of the way to the SA unit, without further incident. By his own testimony, grievant struck the inmate because he, grievant, was "angry," because he felt the inmate "deserved" it, and in order to "smarten him up." Grievant filed no report concerning the circumstances of this move.

At some point prior to the time grievant commenced working at the South Burlington facility, the administration promulgated "Personnel Rules & Regulations" setting forth standards of conduct for the facility staff members. Number 17 of those rules provides as follows:

> No employee or volunteer shall "use force" against a resident except within the guidelines of the Burlington Facility and Department of Corrections policy bulletin #1041. Policy will be taught in training, but it is the responsibility of each employee to know.

Policy Bulletin 1041, referred to in rule 17, provides, in pertinent part, as follows:

Sound correctional practices minimize the necessity for using force.

. . . .

Force may only be applied where there is direct and imminent threat of escape, or when the resident presents an imminent threat of bodily harm to himself, an employee, another resident, or any other person, or when all other available alternatives to effect legal order have been tried and failed.

. . . .

In no case is it justifiable for an employee to retaliate in kind against an inmate because that employee has been abused by an inmate. An employee's use of any punitive sanction on his own is clearly forbidden.

. . . .

When force must be used on a resident, the employee(s) involved will notify his immediate supervisor as soon as the incident requiring the use of force is ended. In addition, a written report will be submitted to the Superintendent within 24 hours stating the names of those involved, time, place, and circumstances of the incident, and a description of the force used.

Rule 17 is one of several in the list which is preceded by an asterisk; on the final page of the rules the asterisk is explained:

There are five categories of discipline in order of severity:
1. Oral reprimand
2. Written reprimand
3. Suspension without pay
4. Demotion
5. Dismissal

This facility subscribes to a policy of progressive discipline. Repeated offenses warrant increased discipline, and serious offenses draw higher penalties than lesser offenses. * indicates suspension or dismissal and may occur at first offense.

Thus, a violation of the rule 17 prohibition against excessive and unjustified use of force could warrant suspension or dis-

missal in the first instance. When he commenced working at the South Burlington facility in 1978, grievant signed the following memorandum:

> I have read the Personnel Rules and Regulations. I have had the opportunity to review this information in its entirety, and have also had an opportunity to have my questions answered by my Supervisors. I completely understand my responsibility in these areas and understand I will be accountable for following these Rules and Regulations.

As grievant had filed no report concerning the incident in question, the superintendent of the South Burlington facility only learned of it inadvertently, a month after it occurred. In the course of reprimanding another corrections officer for using excessive force on an inmate, the superintendent was asked by the officer why *he* should be disciplined when grievant, a supervisor, had assaulted an inmate with impunity. The superintendent immediately ordered an investigation.

In the course of the investigation, grievant was ordered to write a "use of force" report regarding the June 6 incident. All the officers who had observed grievant on that night were also required to submit statements. While the other officers' reports reflect the facts as recited above, grievant's report failed to mention any of the assaults, and concluded with the following: "At no time was undo [sic] force used during this move." The superintendent reviewed the evidence, including these statements, as well as grievant's complete personnel file. In mid-July, he requested grievant to explain his conduct. Grievant declined to discuss the matter, stating that he would rely solely on his "use of force" report.

On July 16, 1980, the superintendent dismissed the grievant. The dismissal letter cited grievant's violation of rule 17 and policy bulletin 1041, noting that such rule is designated as one "for which one could be suspended or dismissed upon first offense." The letter went on:

> Unnecessarily beating and striking a resident (inmate) constitutes gross neglect of duty as well as conduct which places in jeopardy the life and health of a person under the employee's care; conduct for which one maybe [sic]

dismissed without prior notice or pay, in accordance with Article XV, Sections (3a) and (3d) of the State Employee's Bargaining Agreement.

Article XV of the State Employee's Bargaining Agreement provides, in pertinent part, that while progressive discipline is the governing procedure, "there are appropriate cases that may warrant the State bypassing progressive discipline or applying discipline in differing degrees so long as it is imposing discipline for just cause." Furthermore, the agreement provides that while the employer must give either two weeks' notice or two weeks' pay to an employee dismissed for just cause, an employee "may be dismissed immediately" for "gross neglect of duty" or for "conduct which places in jeopardy the life or health of a co-worker or of a person under the employee's care."

 After hearing the Board found, *inter alia,* that grievant used excessive force amounting to an assault against an inmate under his care, in knowing violation of the facility's rules and regulations; that he failed to file the requisite "use of force" report in an attempt "to conceal the fact [of the incident] from his supervisors"; and that he had "fair notice" that such conduct could be grounds for immediate dismissal. The Board then correctly concluded that its role was to determine whether "just cause" existed for the dismissal, as that term has been defined by this Court in the case of *In re Brooks,* 135 Vt. 563, 382 A.2d 204 (1977):

> Just cause means some substantial shortcoming detrimental to the employer's interests . . . which the law and a sound public opinion recognize as a good cause for his dismissal.

*Id.* at 568, 382 A.2d at 207–08 (citations omitted). In *Brooks* we stated that the "ultimate criterion of just cause is whether the employer acted reasonably in discharging the employee because of misconduct." *Id.* This requires a determination that (1) it is reasonable to discharge employees because of certain conduct, and (2) the employee had fair notice that such conduct would be ground for discharge. *Id.*

The Board concluded that while the "notice" requirement for just cause was met, in this case it was not "reasonable"

for the State to discharge grievant. In making this determination, the Board characterized its decision-making role as follows: "In the case before us, we must look to the nature of the act and the circumstances in determining whether dismissal was the proper remedy." Based upon the fact that both the facility's rules and the collective bargaining agreement contemplated a scheme of progressive discipline, and upon consideration of "mitigating circumstances," the Board concluded that "a lesser measurement of punishment" was in order, and thus that no just cause existed for the dismissal. Parenthetically, the Board also concluded that the unnecessary force used by grievant amounted neither to "gross neglect of duty," nor to "conduct which places in jeopardy the life and health of a person under the employee's care." The Board then determined that the "appropriate penalty for the offense committed" was reinstatement, demotion and back pay.

As we have stated elsewhere, the essence of the Board's order here is that it disagrees with the action taken by the employer. *In re Gage*, 137 Vt. 16, 19, 398 A.2d 297, 299 (1979).

> Both the standards to be applied in determining whether just cause exists for the dismissal of a state employee and the Board's role in that determination have been clearly defined by this Court in the past. They should by now be beyond any misapprehension.

*In re Harrison*, 141 Vt. 215, 219, 446 A.2d 366, 367 (1982). We have consistently reminded the Board that by substituting its own judgment for that of the employer, the Board "misconstrues its function." *In re Gage, supra*, 137 Vt. at 19, 398 A.2d at 299. See also *In re Muzzy*, 141 Vt. 463, 469, 449 A.2d 970, 973–74 (1982) ; *In re Harrison, supra*, 141 Vt. at 219, 446 A.2d at 367; *In re Carlson*, 140 Vt. 555, 560, 442 A.2d 57, 60 (1982). Nevertheless, we hasten yet again to clarify the Board's function:

> [The Board's] duty is to decide whether there was, in law, just cause for the action taken, not whether it agrees or disagrees with that action. It has power to police the exercise of discretion by the employer and to keep such

actions within legal limits. But the Board is not given, by the statute or by the agreement, any authority to substitute its own judgment for that of the employer, exercised within the limits of law or contract.

*In re Gage, supra,* 137 Vt. at 19, 398 A.2d at 299.

Viewed in this light, the Board's conclusions concerning the lack of just cause for dismissal are erroneous, and are unsupported by its own findings. *Id.* These findings show an incident where a supervisor of a correctional facility ignored all established procedure for dealing with an inmate, violated the rules governing use of force, attempted to conceal the incident from his supervisors by not reporting it, and subjected an inmate in his care and custody to four separate assaults on his person. The Board found that such conduct constituted a knowing violation of personnel rules, and that grievant understood that such violation could subject him to immediate dismissal. The Board further found that while the collective bargaining contract cited progressive discipline as the rule, it also provided that "there are appropriate cases that may warrant the State bypassing progressive discipline . . . so long as it is imposing discipline for just cause."

Given the Board's factual findings, there was just cause to support a dismissal, and the State was amply justified in bypassing the progressive discipline system. *In re Carlson, supra,* 140 Vt. at 560, 442 A.2d at 60; *In re Gage, supra,* 137 Vt. at 19, 398 A.2d at 299. The Board's reinstatement order was in error.

*Reversed; the order of the Vermont Labor Relations Board is vacated, and the dismissal is reinstated.*