2009 VT 18

## In re Grievance of Lawrence Rosenberger

[970 A.2d 1257]

No. 07-378

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed February 13, 2009

*William H. Sorrell*, Attorney General, *Bridget C. Asay* and *Julio A. Thompson*, Assistant Attorneys General, Montpelier, for Appellant/Cross-Appellee.

*Abigail A. Doolittle*, *Vermont State Employees' Association*, Montpelier, for Appellee/Cross-Appellant.

¶ 1. **Burgess, J.** The State of Vermont appeals the Vermont Labor Relations Board's decisions reinstating grievant Lawrence Rosenberger to his position as a game warden and awarding him back pay after he was discharged for falsifying a time report to obtain compensation for work not done. One of the main issues for the Board to resolve at the grievance hearing in this case was how to remedy the employer's violation of a collective bargaining agreement provision requiring state employers to inform employees of their right to union representation before being called to a meeting that might lead to disciplinary action. The State argues that the Board erred by adopting criminal law doctrines — the exclusionary rule and its companion fruit-of-the-poisonous-tree doctrine — to exclude from the grievance hearing not only grievant's admissions during an initial interview without union representation, but also his admissions during later investigative interviews when accompanied by a union representative.

¶ 2. We conclude that the Board abused its discretion by excluding the latter admissions in light of its own findings that, prior to the improper questioning, the employer had sufficient reason to suspect wrongdoing and initiate an investigation that would have required grievant to answer questions concerning his suspected wrongdoing. Because no sufficient nexus existed between the improper questioning and the follow-up investigation, and because grievant had union representation at interviews conducted during the inevitable follow-up investigation, there was no basis for the Board either to exclude the admissions grievant made during those interviews or to limit the State's examination of grievant concerning those admissions at the grievance hearing. Accordingly, we reverse the Board's decision and remand the matter for the Board to reopen the proceedings.

¶ 3. Based on the Board's unchallenged findings, the facts are as follows. Grievant was employed as a game warden for the

Department of Fish and Wildlife from 1987 until he was dismissed in August 2005. The incident that triggered the instant disciplinary action and grievance proceedings occurred in the spring of 2005. At that time, off-duty wardens who responded to reports of injured deer were entitled to four hours of overtime compensation. A response of this nature is referred to as a "call-out," and the compensation received is referred to as "call-out pay." Wardens were not entitled to receive call-out pay for responding to a report of a dead deer as opposed to an injured deer.

¶ 4. In the late evening of March 26, 2005, the Essex Police Department received a telephone call about a dead deer lying on the shoulder of Susie Wilson Road in Essex. The following morning, during his regularly scheduled shift, grievant was assigned to deal with the dead deer. Grievant picked up the deer and decided to give it to a person by the name of Joe Gaudette, who declined to take it but suggested that grievant give it to his brother, Bob Gaudette. Grievant did so and reported completing the task at around nine o'clock that morning. Dispatch records indicate that at 8:32 that evening, the evening of March 27, grievant called a PSAP (Public Safety Answering Point) dispatcher from his home and claimed to have responded to a report of an injured deer on the circumferential highway in Essex. Grievant reported the complainant to be someone by the name of Gaudette, although the first name was not entirely clear from the dispatch recording. The dispatch log indicated that grievant reported completing the call-out at 8:53, but the dispatcher did not enter that call into the log until 9:01. On April 2, 2005, grievant submitted a time report for the previous two-week pay period claiming compensation for the March 27 injured deer call-out.

¶ 5. On the morning of April 4, 2005, while reviewing time reports to assure that claims for call-out compensation met established criteria, grievant's direct supervisor, Lieutenant Lutz, noticed that the time period indicated in the dispatcher's log for grievant's March 27 call-out did not appear to leave grievant sufficient time to respond to, and deal with, the injured-deer call. Lutz decided to speak to grievant about the reported call-out, but at that point assumed that the discrepancy with the time periods indicated in the log was the result of dispatcher data-entry error, apparently a common phenomenon.

¶ 6. That same day, grievant came to Lutz's office, and Lutz asked him about the March 27 call-out. After approximately five

minutes of conversation, during which he appeared nervous and emotional, grievant was unable to provide details of the March 27 call-out or satisfy Lutz concerning discrepancies in the time report. Eventually, Lutz asked grievant directly whether he had really responded to a call-out on March 27, and grievant admitted that he had not done so. Lutz then informed grievant that he would not be paid for the call-out, which would be struck from the time report, but that he (Lutz) would not report the incident to his superiors.

¶ 7. Lutz had second thoughts, however, and later that same day informed his superior, Major Lecours, of his conversation with grievant. Lecours then spoke to his superior, Colonel Rooks, who directed Lutz to conduct a preliminary investigation of the March 27 incident and to complete a misconduct complaint form. On April 5, Lutz conducted a preliminary investigation and completed a misconduct complaint form. After reviewing dispatcher tapes and talking to Joe and Bob Gaudette, Lutz concluded in his report that grievant had fabricated the March 27 call to obtain compensation. Following his review of the report on April 8, Rooks assigned another lieutenant, Denton, to conduct an internal investigation regarding the March 27 incident.

¶ 8. On April 14, 2005, Denton conducted a tape-recorded investigative interview of grievant with a Vermont State Employees' Association (VSEA) representative present. Ten days later, Denton conducted a second tape-recorded interview of grievant with the same VSEA representative present. Denton issued a report of his investigation on June 8, 2005. Based on that report, the Commissioner of the Department of Fish and Wildlife sent grievant a letter on July 20 indicating that the Department was contemplating dismissing him for misconduct related to the March 27 incident. By letter dated August 22, 2005, after meeting with grievant to allow him to respond to the earlier letter, the Commissioner notified grievant that he was dismissed effective that date.

¶ 9. In September 2005, grievant filed a grievance challenging his dismissal. Five months later, he filed a motion to exclude evidence directly or indirectly obtained by the State as the result of his April 4, 2005 meeting with Lutz and the subsequent investigation stemming from that meeting. Following a hearing on the motion, the Board determined in a March 2006 decision that the employer had violated Article 14, § 7 of the collective bargain-

ing agreement between the VSEA and the State, which provides in pertinent part as follows:

> Whenever an employee is required, by his or her supervisor or management, to give oral or written statements on an issue involving the employee, which may lead to discipline against the employee . . . he or she shall be notified of his or her right to request the presence of a VSEA representative and, upon such request, the VSEA representative shall have the right to accompany the employee to any such meeting. The notification requirement shall not apply to the informal initial inquiry of the employee by his or her supervisor without knowledge or reason to believe that discipline of the employee was a likely possibility . . . .

¶ 10. The Board concluded that because Lutz reasonably did not suspect grievant of misconduct at the beginning of their first meeting on April 4, but assumed that the discrepancy on grievant's time report was the result of dispatcher error, Lutz had no obligation under the above provision to inform grievant of his right to have a VSEA representative present. But the Board also concluded that Lutz should have informed grievant of that right before asking him directly whether his reported March 27 call-out was legitimate. The Board reasoned that Lutz suspected misconduct at that point and should have realized that grievant's answer to his question could lead to disciplinary action against grievant. Accordingly, the Board precluded the State from relying on grievant's admission following Lutz's direct inquiry as to the suspected wrongdoing.

¶ 11. The Board further determined, however, that any admissions grievant made during the later Denton interviews in the presence of the union representative could not be considered independent of his admission at the April 4 meeting and thus would also have to be excluded. According to the Board, the significance of the right to union representation would be eviscerated if an employer could obtain incriminating information from an unrepresented employee and then procure the same information at a later interview in which the employee had representation. The Board reserved judgment at that time as to whether the State could rely on other evidence obtained in the follow-up investigation.

¶ 12. In a later decision, following another hearing, the Board rejected grievant's position that all evidence obtained by the employer following Lutz's improper question at the first meeting must be excluded. The Board noted that such a position disregarded its previous conclusions that Lutz reasonably suspected grievant of misconduct before he asked the improper question, and that, because of those reasonable suspicions, the employer would have further investigated the suspected wrongdoing even without grievant's response to the improper question. According to the Board, excluding all evidence obtained in the investigation following the first meeting would put the employer in a worse position than it would have been had it not asked the improper question — an outcome that would be contrary to its longstanding position of putting the employer and employee in the same position as they would have been absent the offending conduct.

¶ 13. Nevertheless, the Board reiterated that it would not be appropriate for the State to rely on any admissions grievant made, not only during the first meeting in response to Lutz's improper question, but also at the follow-up Denton interviews when grievant had VSEA representation. Thus, the State was precluded from relying on any comments acknowledging misconduct made by grievant's representative at the meeting with the Commissioner after grievant had been informed that the employer was contemplating dismissal — at least to the extent that any such comments were inextricably intertwined with the admission wrongfully procured at the first meeting on April 4. Further, the State was precluded from asking any questions of grievant at the grievance hearing aimed at obtaining admissions concerning the March 27 incident. In the Board's view, such questions would be seeking to obtain evidence tainted by the employer's wrongful questioning of grievant at the initial meeting.

¶ 14. Considering only the limited evidence allowed by these rulings, the Board held three days of hearings on the merits of the grievance in the late summer and early fall of 2006. In March 2007, the Board issued a decision concluding that the State failed to present sufficient evidence to prove the charged misconduct. Accordingly, the Board sustained the grievance, reinstated grievant to his position as game warden, and ordered back pay with interest effective from the date of his dismissal. In an August 2007 decision, following another hearing, the Board resolved disputes concerning back pay and other benefits.

¶ 15. On appeal, the State argues that (1) neither the exclusionary rule nor the related fruit-of-the-poisonous-tree doctrine is relevant to the admissibility of evidence in this civil grievance proceeding; and (2) the Board's remedy for a contract violation was unsupported by both the collective bargaining agreement and the Board's longstanding precedents. Grievant cross-appeals, arguing that the Board erred by failing to exclude all evidence obtained by the employer through its investigation following the April 4 meeting. Grievant also disputes some of the Board's rulings with respect to back pay.

¶ 16. We begin with the principal issue in this case — whether the Board erred by excluding evidence of statements and admissions that grievant made in the Denton interviews following the first meeting between himself and Lutz. Before beginning, however, we note that grievant is not challenging the Board's admission of evidence procured before Lutz's improper question. Nor is the State challenging the Board's determination that the evidence presented at the merits hearing was insufficient to support the misconduct charges.

¶ 17. For the most part, the State frames the main issue in this appeal as whether the exclusionary rule and its related fruit-of-the-poisonous-tree doctrine are relevant in civil grievance proceedings. In simplistic terms, the exclusionary rule is a criminal-law doctrine precluding the admission of evidence directly obtained as the result of unconstitutional police conduct, and the fruit-of-the-poisonous-tree doctrine extends the exclusionary rule to preclude the admission of "tainted" evidence derived from the constitutional violation. See 6 W. LaFave, Search and Seizure § 11.4, at 255-56 (4th ed. 2004). According to the State, these doctrines are not relevant in civil proceedings, and particularly here, because this case does not concern unconstitutional intrusions, the main evil that the doctrines are designed to deter. See *Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999) (noting that fruit-of-the-poisonous-tree doctrine, like exclusionary rule, is designed to safeguard Fourth Amendment rights through deterrent effects); *People v. McGrath*, 385 N.E.2d 541, 543 (N.Y. 1978) ("[T]he exclusionary rule functions as a judicially created tool for the effectuation of constitutionally guaranteed rights."); cf. *State v. Lussier*, 171 Vt. 19, 30, 33, 757 A.2d 1017, 1025, 1026-27 (2000) (noting that focus of any analysis addressing scope of exclusionary rule should be on protecting individual constitutional

rights at stake, and concluding that applying exclusionary rule to civil license suspension proceedings is appropriate because it will protect constitutional privacy rights and deter unlawful police conduct).

¶ 18. This appeal, however, only tangentially concerns the scope of the exclusionary rule and its related doctrines. At its heart, this case is about the State's violation of the collective bargaining agreement, a contract, and specifically, the appropriateness of the remedy imposed by the Board in response to that violation. The salient issue is whether the Board abused its discretion in remedying the violation by precluding the State from relying on certain evidence, including statements made by grievant in the Denton interviews after, and separate and apart from, the inappropriate question at the first meeting.

¶ 19. Here, the Board did not adopt the exclusionary rule or the fruit-of-the-poisonous-tree doctrine, but rather analogized to those principles in considering the appropriate remedy in this case, taking into account the nature of the violation and the policy concerns underlying the violated provision. In so doing, the Board did not act beyond the scope of its authority. 3 V.S.A. § 982(g) ("The board is authorized to enforce compliance with all provisions of a collective bargaining agreement upon complaint of either party."). Indeed, the State acknowledges that the Board acted appropriately by excluding evidence obtained directly as the result of questioning that violated the collective bargaining agreement's notice provision. The Board has long imposed such a remedy under similar circumstances in previous grievance proceedings. See, e.g., *In re Tatro*, 10 V.L.R.B. 78, 85 (1987) (excluding statements made by grievant at meeting in which employer contemplated discipline but did not inform grievant of his right to VSEA representation, and noting that employer should not benefit from fruits of tainted interview); *In re Dustin*, 9 V.L.R.B. 296, 302 (1986) (sustaining grievance where sole basis for grievant's dismissal was evidence obtained at contractually prohibited interview in which employer did not inform grievant of his right to VSEA representation); *In re Boucher*, 9 V.L.R.B. 50, 59 (1986) (finding that employer's failure to inform grievant of right to VSEA representation did not affect dismissal decision because grievant made no harmful statements during the interview, but noting that any harmful statements at improper interview would have been excluded). Therefore, we need not engage in the parties' second-

ary debate about the relevance of National Labor Relations Board cases construing a federal statute containing language that is distinguishable from Vermont law.

■ ¶ 20. The real question, then, is whether the Board abused its discretion in applying the remedy that it did in this particular case. In the past, we have emphasized that "the Board has broad authority to fashion a suitable remedy, and its judgment will be upheld absent an abuse of discretion." *In re Whitney*, 168 Vt. 209, 216, 719 A.2d 875, 880 (1998); see *In re VSEA*, 2005 VT 129, ¶ 7, 179 Vt. 228, 893 A.2d 333 (noting that Supreme Court reviews Board's construction of Article 14, § 7 "with substantial deference"); see also *Duryea Borough Police Dep't v. Pa. Labor Relations Bd.*, 862 A.2d 122, 127 (Pa. Commw. Ct. 2004) (noting that labor board has broad administrative discretion to fashion remedies in response to violations of employees' right to union representation). This does not mean, however, that any remedy is acceptable without regard to whether it is reasonable or tied to actual harm. See *Whitney*, 168 Vt. at 216, 719 A.2d at 880 (recognizing that remedies normally should reflect actual harm); *Commonwealth v. Pa. Labor Relations Bd.*, 768 A.2d 1201, 1206 (Pa. Commw. Ct. 2001) (stating that court will not interfere with board's remedy "so long as the remedy is reasonable, is within the Board's powers and is consistent with prior court decisions").

■ ¶ 21. Reviewing the Board's decisions with these standards in mind, we first note that nothing in the collective bargaining agreement provides a specific remedy for violations of the provision requiring state employers to inform employees of their right to VSEA representation before discipline is contemplated. As suggested above, however, excluding evidence obtained directly as the result of a violation of that provision would certainly be a reasonable remedy in many situations. When there is a direct connection, or nexus, between the violation and the discovery of the challenged evidence, the evidence is not independent of the violation and is therefore "tainted." Cf. *State v. Bryant*, 2008 VT 39, ¶ 58, 183 Vt. 355, 950 A.2d 467 (Dooley, J., concurring in part and dissenting in part) (exclusion remedy may be invoked only if there is causal connection between unlawful police action and discovery of evidence).

¶ 22. On the other hand, if there is no nexus, and the evidence is obtained independently from the violation, exclusion of the

evidence generally is not appropriate. Cf. *State v. Phillips*, 140 Vt. 210, 218, 436 A.2d 746, 751 (1981) (noting "fundamental principle" that connection between illegal action and discovery of challenged evidence may be sufficiently attenuated so as to make evidence independent of illegality and therefore admissible). The appropriate remedy is less certain when there is a connection between the violation and the challenged evidence, but that connection is attenuated and indirect. Cf. *Bryant*, 2008 VT 39, ¶ 58 (Dooley, J., concurring in part and dissenting in part) (noting that exclusionary rule prohibits derivative evidence indirectly obtained as result of unlawful search up to point at which connection becomes so attenuated as to dissipate taint). The Board recognized these principles in analogizing to the exclusionary rule's independent-source exception, which, in criminal cases, allows the admission of evidence when the causal connection between the constitutional violation and the discovery of evidence is so attenuated as to dissipate any taint. Cf. *id.* (discussing independent-source doctrine).

¶ 23. The problem here, however, is that, even if we assume that the Board could disallow "tainted" evidence indirectly tied to a contract violation, the Board in this case failed to examine the evidence or make critical findings supporting its conclusion that grievant's later statements were tainted. Nowhere does the Board explain its conclusion that grievant's admissions with VSEA representation were the fruit of, and thus not independent of, the employer's wrongful questioning at the first meeting. Cf. 6 W. LaFave, *supra*, § 11.4(a), at 259 (noting that question of whether causal connection is too attenuated to support exclusion of evidence is matter of degree and thus dependent upon examination of particular facts of each case). Nor did the Board offer any explanation to support its conclusions that allowing the later admissions would eviscerate the significance of the right to union representation and would put the State in a better position than if the improper questioning had not occurred.

¶ 24. Indeed, not only are these conclusions unsupported, but the record and the Board's own findings unequivocally demonstrate that, before the improper question, the employer *already* had developed suspicions of defendant's wrongdoing, and thus surely would have investigated the matter further and required grievant to respond to questions concerning the suspicious March 27 call-out claim. Moreover, the record and the Board's findings

show that, by excluding all evidence of grievant's admissions, including those obtained when grievant had VSEA representation, the Board put the employer in a far worse position than it would have been had there been no improper questioning. Cf. *Bryant*, 2008 VT 39, ¶ 58 (Dooley, J., concurring in part and dissenting in part) (noting that independent-source exception "is designed to prevent too much evidence from being excluded" so as not to put police in worse position than they would have been absent constitutional violation).

¶ 25. The Board found that, at the beginning of the first meeting on April 4, Lutz reasonably assumed that the discrepancies in grievant's time reports were the result of dispatcher error. The Board also acknowledged, however, Lutz's deposition testimony that when, at that first meeting, he asked grievant about his request for compensation for the reported March 27 call-out, grievant became very nervous, emotional, defensive, and evasive, causing Lutz to suspect wrongdoing. As Lutz conceded in his deposition testimony, by the time he asked grievant whether the March 27 call-out was legitimate, he suspected misconduct and knew that discipline was a likely result of such misconduct. Thus, the Board found that although it was reasonable for Lutz, at the beginning of the April 4 meeting, not to suspect grievant of wrongdoing, grievant's reaction to Lutz's questioning caused Lutz to reasonably suspect grievant of wrongdoing before Lutz directly asked grievant if he had actually gone out on the March 27 call-out. The Board further found that, given Lutz's reasonable suspicions, "it does *not* follow that the Employer would *not* have further investigated Grievant but for Lutz's improper questioning of him." (Emphasis added.)

¶ 26. In short, as the record demonstrates, and as grievant acknowledges in his brief, the Board assumed that the employer would have commenced an investigation into the March 27 call-out even if Lutz had not asked the improper question.[1] Hence, we

---

[1] We do not engage in appellate fact-finding, as the dissent contends, but rather reiterate only what the Board itself found and concluded. The Board stated that in light of grievant's statements to Lutz prior to the improper question, "it was reasonable for Lutz to suspect that Grievant had committed misconduct" in falsely claiming call-out compensation for March 27. Lutz may have initially told grievant following the interview that he intended to deny the overtime compensation without reporting the violation, but he understandably had second thoughts in light of his responsibility to report such violations. For this reason, the Board expressly

reject grievant's contention that the Board improperly imposed upon him the burden of demonstrating a causal connection between the contract violation and his subsequent admissions. Plainly, at the point Lutz asked the improper question, he suspected serious misconduct — falsifying a time report — which undoubtedly would have led to a follow-up investigation to determine whether those reasonable suspicions were accurate. Upon unexpectedly realizing that grievant had most likely falsified his time report, Lutz asked grievant directly if he had actually gone out on the March 27 call-out. If Lutz had realized that he could not ask such a question directly without giving grievant notice of a right to VSEA representation, the questioning would have ceased at that time. But further investigation and more direct questioning of grievant — this time with a VSEA representative present — was inevitable. Indeed, Lutz testified as to his duty to report suspicions of such conduct and of his awareness that disciplinary action was the likely result of such misconduct.

■ ¶ 27. Further, at any follow-up interview, grievant would have been obligated to respond to inquiries concerning the March 27 incident, or otherwise face the risk of being fired for refusing to respond. See *In re Adams*, 22 V.L.R.B. 271, 282-83 (1999) (allowing employer to discipline employee for failing to cooperate fully with investigation). Thus, even if the improper question had not been asked at the first meeting, there is no basis to assume that grievant ultimately could have avoided the question. Indeed, given his supervisor's clear suspicion arising from the allowable portion of the first interview, grievant had limited options at the inevitable follow-up interview. He could admit guilt or refuse to answer, resulting in dismissal; or he could deny wrongdoing or offer explanations for the discrepancies in the reports concerning the March 27 incident, resulting in the implausible explanations set forth in the record before us. In short, there is nothing in the record indicating that the State gained any advantage from grievant's single admission at the April 4 meeting. Therefore, any taint stemming from the employer's improper question at that

---

rejected grievant's position that the employer "would not have further investigated Grievant but for Lutz's improper questioning of him." In essence, grievant wants this Court to accept the Board's finding that Lutz suspected wrongdoing prior to asking the improper question, but reject the Board's finding that an investigation would have ensued regardless of the question because of that suspected wrongdoing. Grievant cannot have it both ways.

meeting is far too attenuated for the Board to preclude the employer from thereafter questioning grievant about its legitimate and reasonable suspicions that preceded the improper question.

¶ 28. We find unconvincing grievant's contention that the record and the Board's findings demonstrate that the Denton interviews were not independent of his April 4 admission. Grievant emphasizes that the Commissioner decided to conduct an internal investigation of the March 27 incident based solely on information obtained through Lutz. That fact is not helpful to grievant, however, given the Board's finding that Lutz had reasonable suspicion of wrongdoing independent of grievant's admission. Grievant relies heavily on his claim that the Commissioner conceded at his deposition "that it would be 'pure speculation' to say that an investigation would have been done if Lutz had not told him about [grievant's] *admissions* on April 4." (Emphasis supplied.) This argument misstates the Commissioner's testimony. What the Commissioner characterized as "pure speculation" was whether there would have been an investigation had Lutz "never discussed with you or anyone else his April 4th, 2005 *conversation* with [grievant]." (Emphasis added.) There was no concession that an investigation would not have occurred but for grievant's admission. The Commissioner merely acknowledged an investigation may not have taken place if Lutz had never reported anything to anybody concerning the April 4 meeting. The Commissioner did not concede, nor does the evidence suggest, that an investigation would not have been prompted by what the Board found to be the supervising lieutenant's reasonable suspicions of misconduct based on the portion of the April 4 conversation preceding grievant's admission in response to the improper question.

¶ 29. Hence, notwithstanding the Board's conclusion to the contrary, we conclude that the Board's far-reaching exclusion of evidence placed the State in a far worse position than if Lutz had never asked the improper question. Cf. *Nix v. Williams*, 467 U.S. 431, 443-44 (1984) (explaining that analytically similar inevitable-discovery and independent-source doctrines are both intended to ensure that suppression of evidence does not outrun deterrence objective by putting prosecution in worse position than it would have been absent police error or misconduct). Neither the terms of the collective bargaining agreement itself, nor general policy concerns supporting such employer-employee agreements, suggest

that Article 14, § 7 was intended to insulate state employees from disciplinary action for misconduct anytime the notice provision was violated, irrespective of whether the contract violation prejudiced the disciplined employee. Cf. *Robinson v. U.S. Postal Serv.*, 28 M.S.P.R. 681, 687 (1985) (stating that purpose of violated collective bargaining agreement provision was not "to shield employees from the consequences of their improper acts"). Indeed, in determining the appropriate remedy, the Board has consistently examined whether procedural contract violations have prejudiced the aggrieved employee. E.g., *Dustin*, 9 V.L.R.B. at 301 (citing *Nzomo v. Vt. State Colls.*, 138 Vt. 73, 75-76, 411 A.2d 1366, 1367-68 (1980), for proposition that reversal of employment decision is not warranted when "procedural shortcomings do not affect the ultimate decision to dismiss," but nevertheless sustaining grievance because grievant's statements from improper interview were sole basis for disciplining him); see *Robinson*, 28 M.S.P.R. at 687 (concluding that "agency violations of collective bargaining agreements must be harmful to constitute reversible error"); M. Moberly & A. Lisenbee, *Honing our Kraft?: Reconciling Variations in the Remedial Treatment of Weingarten Violations*, 21 Hofstra Lab. & Emp. L.J. 523, 550 (2004) (citing National Labor Relations Board cases holding that violations of right to union representation ordinarily must prejudice employee before disciplinary actions are overturned).

¶ 30. Notably, there is no evidence in this case that the employer intentionally violated the notice provision so as to place itself in a better position with respect to an investigation of grievant. Nor is there evidence of a recent pattern of similar violations, which might suggest such an intention. Cf. *Boucher*, 9 V.L.R.B. at 60 (noting that grievant had not demonstrated any prejudice resulting from State's violation of VSEA notice provision, but nonetheless awarding grievant severance pay for violation because of State's recent violation of same provision).

¶ 31. The principles of protecting individual employees' rights and deterring employers from engaging in unreasonable discipline are adequately addressed by assuring that employers do not exploit contract violations to obtain unfair advantages over employees. As the United States Supreme Court stated in its seminal case holding that an employer engages in an unfair labor practice by refusing to allow an employee union representation at a meeting in which discipline of the employee is contemplated, the

presence of a union representative safeguards both the interest of the individual employee and the interests of all of the unit employees by assuring "that the employer does not initiate or continue a practice of imposing punishment unjustly." *Nat'l Labor Relations Bd. v. J. Weingarten, Inc.*, 420 U.S. 251, 260-61 (1975). The Court reasoned that an employee "confronted by an employer investigating whether certain conduct deserves discipline may be too fearful or inarticulate to relate accurately the incident being investigated, or too ignorant to raise extenuating factors," but a "union representative could assist the employer by eliciting favorable facts, and save the employer production time by getting to the bottom of the incident occasioning the interview." *Id.* at 262-63; see *In re VSEA*, 2005 VT 129, ¶ 8 (acknowledging analysis underlying *Weingarten* holding).

¶ 32. Article 14, § 7 "embodie[s] the representation rights established by *Weingarten*" and further places "an affirmative responsibility on the employer to ensure that the employee knows about, and can therefore exercise, her *Weingarten* rights." *In re VSEA*, 2005 VT 129, ¶¶ 11, 13. Those rights may be entirely vindicated, even following a violation of Article 14, § 7, during a subsequent investigation with union representation, particularly when the subsequent investigation is sufficiently independent of, and thus not tainted by, the earlier contract violation. That is what occurred here. Duly accompanied by his union representative during the subsequent investigative interviews and his meeting with the Commissioner, grievant was presumably insulated from employer overreaching and intimidation, and afforded the fair opportunity to articulate a counseled response as contemplated by *Weingarten* and the collective bargaining agreement.

¶ 33. Grievant's position — essentially advocating that, notwithstanding lack of prejudice, an employee must be exempt from further questioning once a violation occurs — is unreasonable and not required under the law. Such immunity from inquiry is unnecessary to uphold the *Weingarten* principles or to vindicate the employee's protection under Article 14, § 7. Instead, the less draconian, but effective, device of simply depriving the State of any direct or derivative use of the improperly obtained admission maintains the equilibrium of the parties before and after the breach of contract.

¶ 34. Here, absent any direct or derivative use of improperly obtained admissions, the presence of the union representative at

subsequent interrogations guaranteed the employee's procedural rights. Hence, grievant received the full benefit of the union assistance bargained for, while the employer obtained no advantage from any contractual noncompliance.

■ ■ ¶ 35. In sum, under the circumstances of this case, wherein the record demonstrates an insufficient nexus between the conceded contract violation and the subsequent admissions grievant made when he had VSEA or legal representation, the Board abused its discretion by excluding statements and admissions grievant made at the Denton interviews concerning the March 27 incident, and by not allowing the State to examine grievant at the grievance hearing concerning those statements and admissions, or even the incident itself. The Board did not abuse its discretion, however, by disallowing evidence of admissions made by grievant's union representative at the meeting before the Commissioner, in light of the Board's concern for promoting frank discussion and a mutually satisfactory resolution of grievances. Finally, given our resolution of the previous issues and our reversal of the Board's decisions, we necessarily reject grievant's argument that the Board erred by allowing any evidence resulting from the State's investigation following the April 4 meeting, and we need not address issues concerning the Board's back-pay award.

*The Board's March 30, 2006, June 16, 2006, March 13, 2007, and August 23, 2007 orders are reversed, and the matter is remanded for further proceedings consistent with this opinion.*

¶ 36. **Dooley, J.,** dissenting. While there is much in the majority decision I agree with, I cannot agree with its conclusion, which is based on appellate fact-finding contrary to that of the Board. At best, the Court's opinion justifies a remand for additional fact-finding by the Board. I would, however, find that the Board's fact-finding was adequate and affirm.

¶ 37. In summary, the Board imposed on the State the obligation to prove that it would have disciplined grievant but for the admission that occurred in response to a question that the supervisor asked in violation of Article 14, § 7 of the collective bargaining agreement. That obligation is stated in *Commonwealth v. Pa. Labor Relations Bd.*, 768 A.2d 1201, 1206 (Pa. Commw. Ct. 2001), a case cited favorably by the majority, as follows:

[O]nce a *Weingarten* violation has been established, the burden shifts to the employer to establish that it did not impose the discipline based upon information that it obtained at the unlawful interview. If the employer fails to carry that burden, then a conventional make-whole order will be issued.

The Pennsylvania case is based, in turn, on *Kraft Foods, Inc.*, 251 N.L.R.B. 598, 598 (1980) (once employee shows the violation, "the [employer] must demonstrate that its decision to discipline the employee in question was not based on information obtained at the unlawful interview").[2] Although it reached its standard by a different route,[3] the Board in substance adopted the standard of *Kraft Foods*.

¶ 38. Here, the State showed that the supervisor reasonably suspected that misconduct occurred, but did not demonstrate that he would have pursued that suspicion to the point of a disciplinary investigation against grievant. In fact, the supervisor told grievant, even after grievant had admitted the misconduct, that he would deny the overtime compensation request but would not report grievant for discipline. While he changed course in light of grievant's clear admission of misconduct, there is no evidence of what he would have done if there had been no admission. The Board appropriately found that the State failed to meet its burden. I would affirm that decision.

¶ 39. The majority has two responses to my position, neither of which is supportable. The first is that the Board made a finding, directly contrary to its conclusion, that a disciplinary investigation would have been commenced in any event and grievant would have been required to make a statement, with or without union representation present. See *ante*, ¶ 26 n.1. The "finding" on which the majority relies is a double-negative sentence in the Board's opinion section, and not in the separate findings of fact section, of

---

[2] The make-whole remedy of *Kraft* was overruled in *Taracorp Indus.*, 273 N.L.R.B. 221, 222 (1984), because the Board found that § 10(c) of the National Labor Relations Act prohibited that remedy. *Taracorp* did not affect the burden-shifting analysis of *Kraft*. Vermont has no statute similar to that relied upon by the Board in *Taracorp*.

[3] The Board's decision used the "fruit of the poisonous tree" rule and its "inevitable discovery doctrine" exception, which permits the admission of evidence if the proponent can show by a preponderance of the evidence that it would ultimately or inevitably have been discovered.

its June decision. It says: "since Lutz had reasonable suspicions, it does not follow that the Employer would not have further investigated Grievant but for Lutz's improper questioning of him." The majority turns the double negative into a Board finding that employer would have further investigated grievant.

¶ 40. It is clear from the Board's discussion that the sentence is not a misplaced finding at all; it is instead a discussion of the weakness of a legal argument. In the two paragraphs that include that sentence, the Board is discussing an argument made by grievant that the Board should "exclude all evidence obtained by the Employer after the improper questioning of grievant by Lutz." Grievant made this argument because there was no suspicion of wrongdoing before Lutz questioned grievant, and management initiated its investigation solely because of Lutz's report. The Board labeled this argument as "too simplistic" because the Board had earlier concluded that Lutz reasonably suspected that there might be misconduct from the interview prior to the damning admission, and it therefore did not follow that the employer would not have investigated grievant. In this context, the Board made no finding that such an investigation would have occurred; it simply expressed that grievant's argument was wrong because of the possibility of such a finding. Apart from the obvious observation that a double negative is not equivalent to a positive finding, the majority is erroneous because the sentence does not contain any finding of fact.

¶ 41. The majority's second rationale — that the Board did not "explain its conclusion that grievant's admissions with VSEA representation were the fruit of, and thus not independent of, the employer's wrongful questioning at the first meeting" — is more persuasive as far as it goes. *Ante*, ¶ 23. If that is the error in the Board's decision, however, the remedy is to remand for the Board to make the missing findings. The majority refuses to adopt this appropriate remedy, and instead engages in appellate fact-finding: finding that employer "surely would have investigated the matter further and required grievant to respond to questions concerning the suspicious March 27 call-out claim." *Ante*, ¶ 24.

¶ 42. The use of the word "surely" is a give-away here, a red flag for appellate fact-finding. The least sure thing about this case is what the supervisor would have done if the conversation had stopped before grievant made the admission. Since no one testified specifically on that question, the fact can be determined only by

inference. If the majority believes the Board was not specific enough on what inference it drew, it can remand for that purpose. But only the fact-finder can draw the inference in either direction. By drawing it adversely to grievant, the majority has impermissibly made itself the fact-finder. I respectfully dissent.