NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 129

No. 2016-123

| In re Grievance of John Lepore | Supreme Court |
| --- | --- |
| | On Appeal from Labor Relations Board |
| | October Term, 2016 |

Richard W. Park, Acting Chair

William H. Sorrell, Attorney General, and Bridget C. Asay, Solicitor General, Montpelier, for Appellant.

Timothy Belcher and Kelly A. Everhart, Vermont State Employees' Association, Montpelier, for Appellee.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **SKOGLUND, J.** The State appeals from a decision by the Labor Relations Board that reversed its dismissal of grievant John Lepore and instead suspended him for thirty days without pay. The Board agreed with the State that grievant committed serious offenses and demonstrated "poor judgment and dishonesty related to his fitness for state employment" while serving as a juror in a capital murder trial. It concluded, however, the State could not dismiss grievant given its delay in imposing discipline and its failure to restrict grievant's job duties during the investigation into grievant's misconduct. The State argues that neither ground undermines its conclusion that grievant's serious misconduct warranted dismissal, particularly because grievant suffered no prejudice from the delay. We agree, and we therefore reverse the Board's decision.

¶ 2.     The Board found as follows. Grievant worked as an environmental biologist for the Vermont Agency of Transportation (AOT) from 1992 until his dismissal in July 2015. In this position, grievant evaluated the potential impact of proposed transportation projects, created reports, and coordinated with others to apply for and prepare environmental permits. Grievant interacted with numerous other state and federal employees, and it was important that he gain and keep the trust and respect of his peers.

¶ 3.     In 2005, grievant served as a juror in the federal criminal trial of Donald Fell and engaged in conduct that eventually led to his dismissal from State employment. Fell was charged with two capital offenses, and prosecutors sought the death penalty. In direct contravention of the federal court's repeated instructions to the jury, grievant and his then-girlfriend traveled to Rutland during trial to view the crime scene and the home and neighborhood where Fell's mother lived. Grievant then shared his observations with other jurors during deliberations. The jury found Fell guilty of all charges, and sentenced him to death on the capital counts.

¶ 4.     Five years later, grievant told Fell's post-conviction attorneys about his actions during trial. The attorneys drafted a statement for grievant to sign. Grievant made changes and additions to the statement, and reviewed and initialed each paragraph before signing it. Fell's attorneys then sought to vacate Fell's convictions, alleging juror misconduct. In sworn testimony before the federal court, grievant denied visiting the crime scene during trial, or telling other jurors about his observations.

¶ 5.     In a July 2014 ruling, the federal court concluded that grievant violated the fundamental integrity of Fell's trial by deliberately undertaking an independent investigation. The court found this definitively established by grievant's sworn declaration, the testimony of his then-girlfriend who traveled with him to the crime scene, and the testimony of a later girlfriend with whom he shared his plans. The court explained that grievant had traveled over two hours to view the crime scenes in knowing violation of the court's orders. While there, he viewed extra-record

2

information that was highly relevant to the aggravating and mitigating factors presented at trial. After breaching his oath as a juror, he returned to the courtroom where he purposely neglected to inform the court of his transgressions. And years later, during a post-trial proceeding convened specifically to assess the fairness of Fell's trial, grievant openly lied to the court about whether he had committed these acts. The court concluded that grievant's "extraordinary and continuous defiance of the [c]ourt's directives . . . tainted the integrity of Fell's trial and violated his constitutional right to an unbiased jury." Despite the significant resources that had been invested in Fell's trial, grievant's behavior required the court to vacate Fell's convictions and schedule a new trial.

¶ 6. In August 2014, a Vermont newspaper article identified grievant as the juror responsible for Fell's conviction being overturned and described him as an AOT employee. The article recounted the federal court's findings and conclusions, including its statement about grievant's "brazen disobedience, dishonesty, and unwillingness to decide the case based upon the evidence presented at trial." AOT officials learned of the article, and during the second week of August 2014, a Department of Human Resources (DHR) investigator was assigned to look into grievant's actions. Additional newspaper reports referring to grievant's misconduct and his status as a state employee followed. Other state employees expressed concern to grievant's supervisor about grievant's judgment and disregard of protocol in connection with his service as a juror, and its potential effect in the workplace. Grievant's supervisor had similar concerns, although she did not limit grievant's job duties in any way.

¶ 7. While working on grievant's case, the DHR investigator had twenty-six other active investigations, an unusually high number. His investigation included reviewing the ninety-three-page federal court decision, gathering documents related to a timesheet issue, contacting the U.S. Attorney's Office to obtain a copy of grievant's testimony before the federal court, reviewing the

transcript of that testimony, and collecting media reports involving the Fell trial and grievant's role in it. The investigator issued his report to AOT on March 23, 2015.

¶ 8. A month later, on April 30, 2015, Richard Tetreault, AOT's Director of Highways, informed grievant in writing that AOT was contemplating imposing serious disciplinary action against him including dismissal. The disciplinary charges were based almost exclusively on grievant's conduct in connection with the Fell trial.[*] Grievant did not realize he was under investigation for alleged misconduct until he received the letter. Grievant had an opportunity to respond to the charges on June 10, 2015. He did not appear at the meeting, but a union representative attended on his behalf.

¶ 9. On July 22, 2015, Tetreault terminated grievant's employment based on his finding that grievant committed misconduct and gross misconduct. In reaching his decision, Tetreault evaluated the Colleran factors. See In re Jewett, 2009 VT 67, ¶ 23, 186 Vt. 160, 978 A.2d 470 (identifying and endorsing use of factors articulated in In re Colleran, 6 V.L.R.B. 235, 268-69 (1983), in considering appropriate disciplinary action). Tetreault concluded that grievant's offenses of dishonesty and unethical behavior were unacceptable and intolerable, and constituted serious misconduct. He expressed concern about grievant's credibility in interactions with other state and federal employees. Tetreault considered the fact that grievant had no record of discipline and had been viewed as a satisfactory employee, although he noted that grievant had a history of needing to correct his behavior with coworkers. He determined that grievant's misconduct undermined his supervisors' and coworkers' trust in him, and that grievant's credibility could not be restored given the severity of his actions and dishonesty. As to the remaining factors, Tetreault found that: the penalty of dismissal was consistent with that imposed on other employees who had

---

[*] The letter also included a charge that grievant had falsified a timesheet by claiming sick time while he was testifying in federal court. The Board concluded that the State did not establish this charge by a preponderance of the evidence, and the State does not challenge this ruling on appeal.

4

committed such serious dishonesty; grievant's offenses had been reported in the media and were well-known across the AOT and other state and federal agencies that interacted with AOT; grievant's behavior exposed the State to serious potential liability; AOT's reputation could be severely undermined if it did not dismiss grievant; grievant had fair notice that he should not engage in dishonest and unethical behavior, and he did not demonstrate good potential for rehabilitation given his pattern of behavior. Tetreault found no mitigating circumstances diminishing the seriousness of grievant's misconduct, and he concluded that dismissal was the only acceptable action.

¶ 10. The Vermont State Employees' Association (VSEA) filed a grievance with the Board, arguing in relevant part that the State violated the collective bargaining agreement (CBA) by failing to impose discipline within a reasonable time and dismissing grievant without just cause.

¶ 11. Following a hearing, the Board concluded that the State abused its discretion in dismissing grievant. At the outset, it agreed with grievant that the State did not "act promptly to impose discipline . . . within a reasonable time of the offense" as required by the CBA. It found that although AOT became aware of the bulk of grievant's alleged misconduct from an August 2014 newspaper article, it took seven months to complete an investigative report, and several more months elapsed before grievant was dismissed. The Board rejected the argument that the investigator's heavy workload justified the State's violation of the prompt-discipline requirement. It also rejected the State's assertion that it should not find a violation of this provision because grievant failed to show that he was prejudiced by the delay. The Board found that grievant suffered some inherent prejudice from the delay because he was entitled to rely on AOT's inaction, and it was unfair and prejudicial for an employee to have to defend against a stale charge of misconduct. The Board also found an "obvious prejudice" to the collective bargaining relationship between the State and VSEA due to the State's flagrant violation of this procedural due process provision.

¶ 12. Turning to the merits, the Board evaluated whether the State had just cause to dismiss grievant. It found that the State had established all of its charges against grievant, with the exception of a timesheet charge. It concluded that a nexus existed between grievant's off-duty conduct and his employment, linking grievant's disregard for the integrity of legal processes and his disrespect and dishonesty toward legal authorities with his job duties contributing to the enforcement of transportation and environmental laws and regulations. The Board also found that grievant's misconduct and dishonesty in a high profile criminal trial, which received media attention in which grievant was identified as a state employee, brought discredit to the State in violation of State personnel policies and procedures. The Board considered grievant's misconduct to be serious.

¶ 13. Nonetheless, in reviewing the Colleran factors, a majority of the Board questioned whether AOT truly considered grievant's actions to be serious misconduct given its delay in imposing discipline. For the same reason, the majority questioned the sincerity of AOT's findings as to the notoriety of grievant's misconduct and its impact on AOT's reputation, as well as its effect on grievant's credibility and on his ability to perform his duties. Had AOT truly distrusted grievant and viewed his conduct as egregious, the majority reasoned, it would have suspended him during the investigation or restricted his duties in some fashion. Because he stayed on the job during the lengthy investigation, the majority found that AOT must have believed that grievant had some potential for rehabilitation and that his offenses had not completely compromised grievant's ability to perform his job. Based on its analysis, the majority concluded that the State abused its discretion in dismissing grievant, and it determined that a thirty-day suspension without pay was an appropriate sanction.

¶ 14. A dissenting Board member concluded that the State had just cause to dismiss grievant. While not condoning the State's significant violation of the CBA, the dissenting member argued that this violation did not override in importance the misconduct underlying grievant's

6

dismissal, particularly given that grievant demonstrated no prejudice as a result of the violation. The State appealed from the Board's decision.

¶ 15. The State argues that it acted within its discretion in analyzing the Colleran factors and concluding that dismissal was appropriate. While the State concedes for purposes of appeal that the delay in imposing discipline violated the CBA, it contends that grievant suffered no prejudice from the delay, and that this delay did not warrant reducing the appropriate sanction. In a similar vein, the State argues that its decision not to suspend grievant during the investigation does not undermine its disciplinary decision. The State maintains that the Board overstepped its role in reversing grievant's dismissal.

¶ 16. We agree. With respect to the merits of this dismissal case, "[i]n a grievance proceeding, the Board's role is limited to determining whether the State met its burden of demonstrating by a preponderance of the evidence that there was just cause for dismissal." In re Jewett, 2009 VT 67, ¶ 23. "Just cause means some substantial shortcoming detrimental to the employer's interests . . . which the law and a sound public opinion recognize as a good cause for . . . dismissal." In re Goddard, 142 Vt. 437, 443, 457 A.2d 637, 641 (1983) (quotation omitted). The "ultimate criterion of just cause" is reasonableness. Id.

¶ 17. In reviewing the State's disciplinary decision, the Board may not "substitute its own judgment for that of the State." In re Jewett, 2009 VT 67, ¶ 24. "In other words, if the State establishes that management responsibly balanced the relevant factors in a particular case and struck a balance within tolerable limits of reasonableness, its penalty decision will be upheld." Id. (quotation and alterations omitted). The Board must defer to the State's decision because controlling and directing the work force "is an inherent management function." Id. (quotation omitted). Thus, as long as the exercise of its management function is "reasonable," the State's decision must be sustained. Id. (quotation omitted).

7

¶ 18. This Court affords deference to the Board's decision on review, but "we also must ensure that the Board has not overstepped its authority by substituting its own judgment for that of the State." Id. ¶ 25. While we will uphold the Board's judgment "absent an abuse of discretion," that "does not mean . . . that any remedy [for a contract violation] is acceptable without regard to whether it is reasonable or tied to actual harm." In re Rosenberger, 2009 VT 18, ¶ 20, 185 Vt. 343, 970 A.2d 1257 (citation omitted). We conclude that the Board overstepped its authority here in questioning the State's rationale, and that its remedy for the prompt-discipline violation was not reasonable or tied to actual harm.

¶ 19. First, as the Board found, grievant committed serious misconduct that related to his fitness as a state employee. He defied a federal court's instructions in a capital murder case, conducted an improper outside investigation, informed fellow jurors about his discoveries, and then lied about his actions under oath. He exhibited extremely poor judgment and brazen dishonesty. He refused to admit wrongdoing either to the federal court or to AOT officials. His misconduct and his status as a state employee were well-known throughout AOT and other state and federal agencies that interacted with AOT. Grievant lost the trust of his coworkers and peers, and his actions brought discredit to the State. The facts, as found by both the State and the Board, support the State's conclusion that based on grievant's serious misconduct, his credibility could not be restored and that the State's reputation would be severely undermined absent his dismissal. It was objectively reasonable for the State to conclude on these facts that it had just cause to dismiss grievant.

¶ 20. Despite the Board's findings, which largely mirrored those made by the State, the Board questioned if the State sincerely believed its own analysis given its delay in imposing discipline and the fact that the State allowed grievant to continue working during its investigation. The Board overstepped its authority in second-guessing the State's rationale. Neither the delay nor the decision not to suspend grievant undermine the objective reasonableness of the State's

8

disciplinary decision. We have stated in a slightly different context that "[i]n reviewing a disciplinary action, the Board does not look beyond the reasons given by the employer in the disciplinary letter for the action taken." In re Hulburt, 2003 VT 2, ¶ 29, 175 Vt. 40, 820 A.2d 186. Just as the Board cannot create its own rationale for disciplining an employee, so too must it refrain from questioning the State's rationale where the State's evaluation of the Colleran factors is objectively reasonable and supported by the record.

¶ 21. In any event, even if the subjective beliefs of grievant's superior were relevant, the evidence does not support the Board's inferences as to the State's "true" beliefs about grievant's misconduct. Mr. Tetreault testified that he believed that grievant was innocent until proven guilty, and that it would be inappropriate for him to discipline grievant based solely on information reported in a newspaper article. He stated that, before acting, he needed to perform his "due diligence" and obtain an investigative report. Thus, after learning of the allegations against grievant in the newspaper, he considered it his role to request an investigation and to await a completed investigative report.

¶ 22. The DHR investigator had twenty-six other active investigations, and it took him seven months to complete the report. There is nothing in the record that links this investigative delay with the State's level of concern about grievant. Indeed, Mr. Tetreault testified that it was only after receiving the report and using it to work through the Colleran factors that he could ascertain for himself the level of risk that grievant posed. Mr. Tetreault testified in detail how he reached his conclusions as to each factor. He emphasized the importance of credibility, honesty, and accountability in his organization's ability to do its work. He expressed his concern for AOT's reputation if grievant remained employed, and explained how grievant's supervisors and coworkers had questioned grievant's credibility. Mr. Tetreualt also described why he did not think that grievant could be rehabilitated, citing the seriousness of grievant's misconduct and his failure to acknowledge any wrongdoing.

9

¶ 23. In sum, the record evidence provided reasonable grounds for AOT's decision not to suspend grievant during the investigation, and reasonable grounds—wholly divorced from AOT's beliefs about the seriousness of grievant's misconduct—why there was a delay in imposing discipline. The Board erred in speculating, contrary to the evidence, that AOT did not actually believe its own rationale for dismissing grievant. As the State points out, moreover, the Board's approach runs contrary to sound public policy. It would essentially require an employer to discipline an employee immediately, even based on incomplete information, in order for it to prove that it had serious concerns about an employee's conduct. This approach would encourage a rush to judgment, with negative repercussions for employees, especially in cases where dismissal results from the conduct.

¶ 24. The Board had a second reason for its decision—a violation of the prompt discipline clause of the contract—but it also erred in concluding that the State should be precluded from dismissing grievant as a remedy for this violation. In determining the appropriate remedy for a contract violation, "the Board has consistently examined whether procedural contract violations have prejudiced the aggrieved employee." Rosenberger, 2009 VT 18, ¶ 29. In this case, the Board found "inherent prejudice" to grievant based on the delay, and "obvious prejudice" to the collective bargaining relationship. Neither ground is supported by the record, and neither supports the remedy imposed by the Board.

¶ 25. The evidence does not establish that grievant relied on this delay to his detriment. Grievant continued to work and receive his salary during the investigation, and he did not suffer any monetary loss from the delay in imposing discipline. Although the delay was lengthy, grievant did not allege that it had any effect on the preservation of facts or testimony, or any other adverse effect on his ability to defend against the State's charges. No such effect is discernable on this record. Given this, the Board's concern about the unfairness of having to defend against a stale charge of misconduct is unfounded here. As to the "obvious prejudice" to the collective bargaining

10

relationship, the Board failed to explain exactly how the collective bargaining relationship was prejudiced, or why, absent any showing of actual prejudice to grievant, it was meaningful here in ascertaining an appropriate remedy. As in Rosenberger, there was no evidence here that the State "intentionally violated" a procedural due process provision in the CBA "so as to place itself in a better position with respect to its investigation of grievant," nor was there any "evidence of a recent pattern of similar violations, which might suggest such an intention." Id. ¶ 30.

¶ 26. In Rosenberger, we concluded that "[t]he principles of protecting individual employees' rights and deterring employers from engaging in unreasonable discipline are adequately addressed by assuring that employers do not exploit contract violations to obtain unfair advantages over employees." Id. ¶ 31. Like Rosenberger, there is no evidence here that the State either sought to, or did, obtain any unfair advantage over grievant through the delay in disciplining him. There is no showing of prejudice. In the absence of any actual harm, the Board acted unreasonably in seeking to remedy this procedural violation by precluding the State from dismissing grievant. As reflected above, the touchstone of the Board's review is the "reasonableness" of the State's decision, and the facts here objectively demonstrate that this standard is satisfied. In light of grievant's extremely serious misconduct and the deference that the Board must afford to the State in exercising its management function, the State's disciplinary decision must be upheld.

The Board's decision is reversed, and the State's dismissal of grievant is reinstated.

FOR THE COURT:

_____
Associate Justice

11