2009 VT 67

**In re Grievance of Dennis Jewett**

[978 A.2d 470]

No. 08-138

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed June 19, 2009

162

*William H. Sorrell*, Attorney General, and *Julio A. Thompson*, Assistant Attorney General, Montpelier, for Appellant.

*Norman R. Blais*, Burlington, for Appellee.

¶ 1. **Johnson, J.** The State of Vermont, on behalf of the Department of Corrections (DOC), appeals a Labor Relations Board decision that ordered DOC to reinstate grievant, Dennis Jewett, whom DOC had dismissed for serious misconduct. The Board agreed that grievant committed misconduct for failing to intervene when an inmate repeatedly cut himself with a razor

blade fragment, but found that this conduct did not warrant dismissal. The State argues that the Board exceeded its authority by substituting its own judgment for that of DOC. We agree. We conclude that DOC's decision to dismiss grievant was reasonable and, therefore, we vacate the Board's decision and reinstate grievant's dismissal.

¶ 2. Grievant was dismissed from his position as a correctional officer at the Chittenden Regional Correctional Facility (CRCF) for failing to intervene when an inmate under his supervision produced a razor blade fragment and repeatedly cut his wrist. Grievant filed a grievance with the Board.

¶ 3. The following facts were either found by the Board or are not disputed. Grievant began working at CRCF in March 1998 as a temporary employee. He completed correctional officer training at the Vermont Correctional Academy in April 1998. In August 1998, grievant became a permanent Correctional Officer I (CO I) and was promoted to Correctional Officer II (CO II) in March 2001. Prior to his dismissal, grievant had not been disciplined at work. He received two overall satisfactory evaluations, and one excellent evaluation.

¶ 4. At the Academy, grievant received training in conflict resolution, physical intervention and suicide prevention. The suicide prevention training materials used at the Academy provide that "[a]ctions should be taken as soon as it is possible to stop [people attempting suicide] from harming themselves, but safety of staff and bystander[s] must also be consider[ed]." During his employment, grievant also received Advanced Communications Techniques (ACT) training, which instructs officers on how to respond to inmate behavior with active listening and communications skills. ACT training teaches officers to verbally deescalate an agitated offender and avoid physical intervention unless inmates are harming others or themselves. DOC directives explain that "[w]hen an offender's behavior represents a danger to people or the safe operation of the facility, staff have [sic] a responsibility to respond. . . . Dangerous behavior includes . . . self-mutilation." In addition, CRCF's directives state that "Correctional Staff has the responsibility to protect inmates from harming themselves." DOC considers ACT and suicide prevention to be core competencies of correctional officers.

¶ 5. On December 19, 2005, grievant was working in the booking area at CRCF as a transport officer, preparing to transport

several inmates to a different facility. Also in the booking area were CO I Edgerly, who had recently completed his probationary employment period, and CO II Giddings. One of the inmates scheduled for transport, K.D., entered the booking area and announced he was not going to be transported anywhere. He then displayed two razor blade fragments, one in his hand and one in his mouth. At the time, K.D. was not restrained in any manner. He sat on a wooden pallet in the booking area. The shift supervisor, Michael Miller, was summoned to the scene. Miller began speaking with K.D., explaining that he would have to surrender the razor blades, submit to a strip search, and be restrained and transported. After fifteen minutes of speaking with K.D., Miller instructed Edgerly to videotape the incident. Before the videotaping began, K.D. made a single cut with a razor above his left elbow that began to bleed visibly, but not profusely. A mental health worker arrived at the scene, and joined Miller in conversing with K.D. After forty-five minutes of discussion, K.D. agreed to comply, and dropped the blade. Grievant was present during the entire discussion.

¶ 6. K.D. submitted to a strip search. Grievant checked K.D.'s clothes, and Giddings searched K.D.'s person, including his mouth. Grievant then put K.D. in a blue plastic chair near the booking desk and placed K.D. in leg irons, handcuffs and a waist chain. The leg irons significantly reduced K.D.'s ability to move his legs and kick. The handcuffs resulted in K.D. being able to move his hands only six to eight inches away from his waist. A nurse arrived, cleaned K.D.'s cut, and determined that it would not require sutures. Miller and the mental health worker left the booking room to discuss whether K.D. could still be transported that evening. According to the Board, "Miller did not announce that he was leaving the booking room, and did not tell Grievant he was now in charge." On the videotape of the incident, Miller can be heard saying, "I'll be back." Miller had the only canister of pepper spray and left with it. The staff remaining in the room was the nurse, grievant, Giddings and Edgerly, who continued to operate the video camera. Grievant was the most senior officer in the room and agreed at the hearing that after Miller left he was in charge of the situation.

¶ 7. Shortly after Miller left the room, K.D. got up from a blue chair and moved over to the wooden pallet. Neither grievant nor Giddings attempted to prevent K.D. from moving. K.D. said, "I

know you guys would try to trick me if I'm sitting right there." Grievant responded, "Who's going to trick you?" K.D. sat down on the pallet, bent his head over and spat out a razor blade into one of his hands. K.D. then stood up and commented that Miller was not as smart as he thought he was, stating: "You think I'd give up my only weapon? Ha. I'm not giving up my only f—g weapon, dude."

¶ 8. Grievant did nothing to respond. Grievant did not radio for assistance, did not ask K.D. to drop the razor blade, and did not attempt to intervene. Using his right hand, K.D. began slicing his left wrist several times over the next thirty-five to forty-five seconds. An offender in a booking area holding cell called out to grievant, "What are you going to do?" Grievant replied, "Nothing, not if he's got another razor," and made a nervous laughing sound. The nurse said, "This is so against everything." Grievant took a couple of steps forward, but did not get closer than ten feet to K.D. and did not enlist Giddings to assist him in getting the razor blade from K.D.

¶ 9. K.D. continued cutting and on his eleventh cut opened a vein that began to bleed profusely. K.D. yelled, "Yeah, that's the one I was looking for the whole f—g time," and "pump baby pump." K.D. then dropped the razor blade to the floor. At this point, the video shows grievant lift a radio to his mouth. Grievant claims he radioed Miller to return to the scene, but there is no audio of him speaking and Miller did not receive any broadcast. Giddings, who was standing by the booking desk, contacted the control room and summoned Miller to the scene. Grievant walked to the booking desk to retrieve gauze. He then approached K.D. and pressed the gauze to K.D.'s wound. This took place approximately 100 seconds after K.D. began cutting himself.

¶ 10. Miller arrived at the scene and using verbal intervention persuaded K.D. to return to the blue chair. Once seated, the nurse examined K.D.'s wounds and determined that he required a trip to the hospital. Paramedics transported him to the hospital where he received treatment. Upon his return to CRCF, K.D. was again prepared for transportation. Two officers loaded K.D. into a transport van that already contained other offenders. At the time, K.D. was restrained with leg irons, handcuffs, a belly chain and a seatbelt. In the van, K.D. produced another razor blade. K.D. was instructed to drop the blade, and when he did not comply with the command, Miller authorized use of pepper spray on K.D. After

being sprayed, K.D. dropped the blade. K.D. was then transported without further incident.

¶ 11. On the following day, a superintendent viewed video footage from both the hand-held video camera and a fixed security camera in the booking area. Based on the incident, the superintendent placed grievant, Giddings and Edgerly on temporary relief from duty with pay, and requested an investigation of their conduct.

¶ 12. Peter Canales, Investigations Unit Chief at the Agency of Human Services, conducted the investigation. On February 3, 2006, Canales interviewed grievant. During the interview, grievant claimed that after K.D. produced the razor blade, he was talking with K.D. In response to Canales' direct question of whether grievant had instructed K.D. to drop the razor blade, grievant unequivocally responded that he had. Because the video did not support these claims, Canales played the video for grievant and asked grievant to indicate where in the sequence of events he had spoken with K.D. Grievant was unable to pinpoint any particular moment when he had spoken, and agreed that no statements were audible on the video, but continued to insist that he had spoken to K.D.

¶ 13. Based on the investigation, the superintendent sent grievant a letter notifying grievant that he was contemplating dismissal for violations of DOC work rules and policies.[1] The letter charged grievant with committing gross neglect of duty, and engaging in conduct that jeopardized the life and health of an offender. This charge was based on DOC's assertion that grievant did nothing to prevent K.D. from leaving the chair in the booking room and took no verbal or physical action to stop K.D. from harming himself until after an inexcusable delay. The letter explained that one of the most important duties of a correctional officer is to "protect the health and safety of offenders," and that grievant's failure to intervene exhibited "utter indifference for the health and safety of offender K.D." DOC also charged grievant with giving dishonest responses during the investigation. This charge was based on grievant's statements to Canales that he had spoken with K.D. during the incident and had instructed K.D. to drop the blade, neither of which was supported by the video.

---

[1] Neither Giddings nor Edgerly was sent a letter. Prior to the investigation, Giddings resigned. DOC chose not to discipline Edgerly because he was an inexperienced officer and had been following Miller's orders to videotape K.D.

¶ 14. Grievant and his attorney attended a hearing. The attorney provided a written response on grievant's behalf. The letter asserted that verbal intervention with K.D. was futile because Miller's previous interaction with K.D. demonstrated that K.D. was not amenable to reasoning. Grievant acknowledged no deficiency in his conduct, and insisted on the propriety of his response, claiming he had behaved properly given the dangerousness of the situation. On July 11, 2006, superintendent sent grievant a letter notifying him of his dismissal.

¶ 15. Grievant appealed his dismissal to the Board, claiming that there was no just cause to warrant discipline and, in the alternative, that there was no reason to bypass progressive discipline. Following a hearing, the Board issued a written order. The Board found grievant committed serious misconduct, but did not find that all of DOC's allegations were supported by the evidence. The Board found that grievant did not commit misconduct by failing to prevent K.D. from leaving the blue chair and going to the wooden pallet. The Board did find, however, that once K.D. moved, grievant "should have engaged in more verbal interaction with [K.D.] to attempt to have him return to the chair in the booking room." The Board also found that grievant's failure to physically prevent K.D. from harming himself was not misconduct because "[a]ny physical actions taken by Grievant during this period would have endangered his safety and perhaps the safety of others." But, the Board found that "Grievant should have asserted himself more vigorously by verbally interacting with [K.D.] to attempt to get him to stop harming himself." In sum, the Board found that grievant committed serious misconduct by (1) failing to engage K.D. in verbal interaction to attempt to persuade him to return to the blue chair, and (2) failing to verbally interact with K.D. to attempt to get him to stop harming himself. The Board did not find that grievant's misconduct exhibited an utter indifference to the health and safety of K.D. because grievant's "unwarranted passivity" was "caused by indecision and caution in a volatile situation, rather than indifference for [K.D.]'s health and safety."

¶ 16. The Board also did not find any basis to support DOC's claims that grievant lied to the investigator. The Board explained that while several of grievant's statements regarding his actions during the incident were not supported by the videotape, "these comments made by Grievant resulted from faulty memory on Grievant's part arising from the confusion and commotion of a

fast-moving incident along with a 46 day delay between the incident and the interview."

¶ 17. Even though DOC proved only some of the charges against grievant, the Board found that the proven conduct was "serious." The Board concluded that grievant acted contrary to his responsibility to ensure the safekeeping of inmates by "failing to engage in more verbal interaction with [K.D.]" The Board further found that grievant's conduct was sufficient to bypass progressive discipline and that grievant had fair notice that his offenses could result in dismissal.

¶ 18. Nonetheless, the Board concluded: "In weighing all of the relevant factors and examining all the circumstances, we ultimately conclude that just cause did not exist for Grievant's dismissal." The Board concluded that DOC did not act reasonably in concluding that grievant was not a good candidate for rehabilitation and in imposing dismissal. The Board based its decision on the following factors: grievant's conduct was not as severe as DOC charged; grievant had a good work record; DOC imposed a comparatively harsh penalty on grievant compared to DOC's choice not to discipline supervisor Miller; and DOC lacked effective policies to deal with razor blades. Thus, the Board imposed a fifteen-day suspension, and ordered grievant's reinstatement with back pay.

¶ 19. DOC filed a motion requesting that the Board reconsider its ruling on the appropriate level of discipline. In its motion, DOC argued that there was no evidence to demonstrate that Miller's conduct was subject to discipline or that lack of a razor policy contributed to grievant's misconduct. DOC also asked the Board to reconsider its decision that grievant was a good candidate for rehabilitation in light of grievant's failure to accept responsibility for his misconduct. The Board denied the motion, and DOC filed a notice of appeal.

¶ 20. On appeal, DOC claims that the Board exceeded its authority by substituting its own judgment for that of DOC. DOC argues that the Board's assessment of the reasonableness of DOC's discipline was flawed because: (1) the Board based its analysis upon irrelevant and factually unsupported factors, namely, DOC's decision not to discipline supervisor Miller and DOC's razor blade policy; and (2) the Board erred in concluding that grievant was a good candidate for rehabilitation given that griev-

ant had continually refused to accept responsibility for his misconduct.

I.

¶ 21. Because this case involves two layers of review, it is particularly critical to outline the role that the Board plays in overseeing the State's disciplinary decisions and, in turn, our role in analyzing the Board's assessment of the discipline. Thus, we begin by examining the relevant standards of review.

¶ 22. Pursuant to article 14, § 1 of the collective bargaining agreement governing grievant's employment with the State, a state employee may be disciplined only when just cause exists.[2] The State as employer must demonstrate just cause by a preponderance of the evidence. *In re Brown*, 2004 VT 109, ¶ 12, 177 Vt. 365, 865 A.2d 402. Ultimately, just cause is a question of reasonableness and to demonstrate such the employer must show: first, that the conduct was sufficient to warrant dismissal, and second, that the employee had fair notice that such conduct could result in dismissal. *In re Brooks*, 135 Vt. 563, 568, 382 A.2d 204, 207-08 (1977). In this case, the parties agree that grievant had notice; therefore the case turns on whether grievant's acts warranted dismissal. We have described just cause for dismissal as "some substantial shortcoming detrimental to the employer's interests, which the law and a sound public opinion recognize as a good cause for his dismissal." *Id.* at 568, 382 A.2d at 207 (citations omitted).

¶ 23. In a grievance proceeding, the Board's role is limited to determining whether the State met its burden of demonstrating by a preponderance of the evidence that there was just cause for dismissal. See *id.* at 570, 382 A.2d at 209. As mentioned, this determination is a question of reasonableness. In assessing the reasonableness of an employer's decision, we have endorsed the Board's use of the factors articulated in *In re Colleran*, 6 V.L.R.B.

---

[2] Article 14, § 1 of the collective bargaining agreement also sets out an order of progressive discipline to be followed in cases of misconduct, but recognizes that certain conduct may warrant bypassing progressive discipline. In addition, article 14, § 3 of the agreement states that an employee may be dismissed immediately without two weeks' notice or pay when the employee has engaged in gross neglect of duty, gross misconduct, or "conduct which places in jeopardy the life or health of . . . a person under the employee's care."

235, 268-69 (1983), available at http://www.state.vt.us/vlrb/ NDecisions1983.htm. See *In re Brown*, 2004 VT 109, ¶ 12 (upholding use of *Colleran* factors); *In re Towle*, 164 Vt. 145, 149-50, 665 A.2d 55, 59-60 (1995) (applying the *Colleran* factors). These twelve factors are: the nature and seriousness of the offense, the employee's job level and type of employment, the employee's past disciplinary record, the employee's work record, the effect of the offense on the employee's ability to perform satisfactorily, the consistency of the penalty with those imposed upon other similarly situated employees, the consistency of the penalty with any applicable agency table of penalties, the notoriety of the offense or its impact on the reputation of the agency, the clarity of notice, the potential for the employee's rehabilitation, mitigating circumstances surrounding the offense, and the adequacy and effectiveness of alternative sanctions to deter such conduct in the future. *In re Colleran*, 6 V.L.R.B. at 268-69. The factors do not comprise an exhaustive list, and not every factor may be relevant in each case. "Management need not prove that each factor supports its decision as reasonable, only that on balance the relevant factors support management's judgment." *Id.* at 269.

█ ¶ 24. If, in light of these factors, the Board determines that just cause exists and the State was warranted in bypassing progressive discipline, the Board does not have authority to substitute its own judgment for that of the State. *In re Gage*, 137 Vt. 16, 19, 398 A.2d 297, 299 (1979). In other words, "[i]f the State establishes [that] management responsibly balanced the relevant factors in a particular case and struck a balance within tolerable limits of reasonableness, its penalty decision will be upheld." *In re Gorruso*, 150 Vt. 139, 146 n.4, 549 A.2d 631, 635 n.4 (1988) (quotation omitted). The State is afforded deference in deciding an appropriate sanction because "it is an inherent management function to control and direct the work force"; thus, as long as "the exercise of that function is reasonable it will be sustained." *Id.* (quotation omitted).

█ ¶ 25. On appeal from the Board's decision, we defer to the Board's construction of the collective bargaining agreement, given the Board's expertise in that area. *Id.* at 143, 549 A.2d at 634. We treat the Board's conclusions with deference and will affirm if they are supported by the findings. *In re Brown*, 2004 VT 109, ¶ 13. In addition, we will not disturb the Board's findings of fact

unless they are clearly erroneous. *Brooks*, 135 Vt. at 567, 382 A.2d at 207. While the Board is afforded deference in these areas, we also must ensure that the Board has not overstepped its authority by substituting its own judgment for that of the State.

## II.

¶ 26. The State argues that the Board did exactly that in this case. The State contends that its decision to dismiss grievant was supported by the evidence and reasonable under the circumstances, and thus the Board exceeded its authority by substituting its own judgment for that of DOC. As explained, the parties agree that grievant had notice that his behavior could result in dismissal; therefore, the sole question is whether grievant's conduct was ·sufficiently egregious to warrant dismissal. See *In re Gorruso*, 150 Vt. at 146, 549 A.2d at 636 (just cause requires notice and action sufficient to warrant discipline).

¶ 27. In answering this question, the Board employed the *Colleran* factors. The Board acknowledged that grievant committed "serious" misconduct, that grievant's "offenses had an adverse effect on his ability to perform at a satisfactory level and on supervisors' confidence in his ability to perform assigned duties," and that "[h]e performed unsatisfactorily in the important duty of preventing and stopping inmates from harming themselves." Nonetheless, the Board concluded that the State's decision to dismiss grievant was excessive given: (1) DOC's inconsistency in the penalty imposed on grievant compared to his supervisor, (2) DOC's lack of effective policies to deal with razor blades, and (3) grievant's satisfactory work record and lack of prior discipline.

¶ 28. We examine each of these contentions in turn, beginning with the Board's concern that DOC's decision to dismiss grievant resulted in unequal treatment. The Board found that DOC punished grievant overly harshly compared to its decision not to discipline supervisor Miller, despite what the Board termed "deficiencies [Miller] exhibited in this incident." According to the Board, Miller did not appropriately follow through on the strip search of K.D., and failed to properly announce that he was leaving the booking area and that grievant was in charge.

¶ 29. The relevant *Colleran* factor that the Board seemed to be employing was the "consistency of the penalty with those imposed upon other employees for the same or similar offenses."

*In re Colleran*, 6 V.L.R.B. at 268. This factor is related to the State's obligation under article 14, § 1(b) of the collective bargaining agreement to apply discipline "with a view toward uniformity and consistency." In applying this factor in the past, we have explained that "[a]s a general rule, the State should treat like cases alike." *In re Towle*, 164 Vt. at 151, 665 A.2d at 60.

▪ ¶ 30. In this case, we conclude there is no logical reason why DOC's decision not to discipline Miller is in any way relevant to DOC's decision to dismiss grievant because Miller did not commit a similar offense or any offense. The Board faulted Miller for failing to properly oversee a strip search and for not announcing that he was leaving the booking room. Grievant was not disciplined for any act related to the strip search; he was disciplined because after K.D. exposed the concealed razor blade and began to cut himself repeatedly, grievant failed to take *any* steps to prevent K.D. from harming himself. Thus, grievant acted contrary to his responsibility to ensure the safekeeping of inmates within his custody — a serious offense that goes to the core of grievant's duty as a correctional officer. On the other hand, as it relates to inmate safety, the Board did not find that any of Miller's conduct relative to protecting inmate K.D. was inadequate. In fact, the Board found that "Miller did a good job using verbal communication skills to persuade [K.D.] to agree to a strip search and use of restraints." Because there is no similarity between Miller's allegedly improper actions and grievant's misconduct, we conclude that the Board improperly considered this factor in deciding whether DOC's choice of discipline was reasonable.[3]

▪ ¶ 31. The deficiency of the Board's reasoning in this case is similar to that in *In re Carlson*, in which the Board found the bulk of the State's charges against the grievant were true, but found dismissal was unreasonable due in part to an alleged pattern of abuse in the department where the grievant worked. 140 Vt. 555, 557-58, 442 A.2d 57, 58-59 (1982). We held that the Board's decision to mitigate the grievant's punishment on this basis was erroneous because "whatever the abuses engaged in by the grievant's superiors, they cannot mitigate all of the grievant's

---

[3] Because we conclude that DOC's decision not to discipline Miller was not relevant to grievant's dismissal, we do not consider the State's argument that there was no evidence to indicate that any of Miller's conduct amounted to a violation of his duties as a correctional officer.

acts, as most were not done in concert with superiors. Indeed, the grievant himself was a supervisor in an important position, and utilized that very power to defraud the State." *Id.* at 559, 442 A.2d at 59. Similarly, in this case, even accepting the Board's assumption that Miller acted improperly, Miller's conduct in no way furthered or contributed to grievant's acts of misconduct. Miller was not even present during the critical period of time. The Board seemed to reason that Miller was at fault for creating the hazardous situation in the first place and that this should mitigate the punishment of grievant. We disagree. Even with adequate and appropriate procedures, DOC cannot ensure that dangerous situations will not arise, but DOC must ensure that its employees are ready and prepared to respond properly if an incident occurs. How the dangerous situation was created is wholly separate from how grievant responded to the situation once it unfolded.

¶ 32. We also conclude that the Board erred in mitigating grievant's discipline based on its perception of DOC's policies regarding razor blades. The Board found that

> the lack of effective policies by the Employer to deal with inmates who had a practice of inappropriately producing razor blades contributed to the events resulting in Grievant's dismissal. The Employer was aware that [K.D.] had inappropriately produced razor blades on past occasions. Nonetheless, there was no policy in place to regulate access to razors for inmates such as [K.D.]. On the day in question, he was able to successfully conceal three razor blades on his person and produce them on three separate occasions. The failure of Employer to have policies in place to prevent this from happening placed correctional officers such as Grievant in a position to fail.

We fail to understand how DOC's razor blade policy, or lack thereof, was relevant in any way to grievant's misconduct. As already explained, the relevant question was *how* grievant responded once K.D. produced the razor blade, not *why* K.D. produced a razor blade. The Board's assumption that a razor blade policy might have prevented K.D. from gaining access to a cutting device, even if true,[4] does not in any way alter grievant's

---

[4] The State argues that the record does not support the Board's finding that DOC's policies on razor blades were inadequate. We do not reach this question

response to the situation once it arose. The evidence does not support the Board's finding that grievant was "in a position to fail." The first time K.D. produced a razor blade, grievant watched Miller use ACT techniques to successfully persuade K.D. to drop the blade and submit to a strip search. Grievant was disciplined because he failed to employ these techniques in accordance with the numerous hours of training he had received. Instead, grievant simply watched while K.D. inflicted harm on himself. Whatever DOC's policy on razor blades, it did not alter or contribute to grievant's behavior and therefore is not relevant.

■ ■ ¶ 33. Finally, we consider grievant's past satisfactory work record and lack of prior discipline. We agree that grievant's past work record, length of service and lack of disciplinary record are relevant, but we are not persuaded that these facts alone are enough to "significantly undermine the State's disciplinary decision." *In re Gregoire*, 166 Vt. 66, 75, 689 A.2d 431, 436 (1996). Grievant's past work record must be balanced against his potential for rehabilitation. See *In re Towle*, 164 Vt. at 150, 665 A.2d at 59-60 (upholding the Board's conclusion that it was reasonable for the State to conclude that the grievant's record of satisfactory work and lack of discipline did not outweigh other factors because the grievant was not a good candidate for rehabilitation); see also *In re Kerr*, 28 V.L.R.B. 264, 282-83 (2006) (concluding that the grievant's dismissal was reasonable given the serious nature of the misconduct and the lack of potential for rehabilitation despite grievant's ten years of service and excellent work record). On this point, we conclude that the evidence does not support the Board's conclusion that DOC "did not act reasonably in concluding [that grievant] was not a good candidate for rehabilitation and that a lesser sanction than dismissal would [have been] effective or adequate."

¶ 34. Grievant's superintendent testified that he decided not to impose a lower level of discipline and send grievant to training because (1) grievant has had many hours of training and yet failed to employ any of the skills he had learned, and (2) grievant expressed no recognition that he acted improperly and no remorse for his actions. The superintendent explained, "I don't think it's

---

because even assuming the Board's findings on the issue are supported by adequate evidence, we conclude that the policy was not relevant to grievant's misconduct.

safe for the inmates, frankly, or for [grievant] to be put back in that situation." The superintendent's testimony was uncontroverted. Even after viewing the videotape and with the benefit of hindsight, grievant continued to insist that he acted appropriately during the incident and that he would conduct himself in the same manner again. Thus, the undisputed evidence indicates that grievant was not a good candidate for rehabilitation given his lack of insight and refusal to recognize any performance problem; the Board's finding otherwise is not supported by the evidence. See *In re Sileski*, 28 V.L.R.B. 165, 195-96 (2006) (explaining that there was no potential for rehabilitation where the employee failed to take responsibility for the misconduct, was dishonest and disregarded authority); see also *Brown v. Dep't of Army*, 96 M.S.P.R. 232, ¶ 14 (2004) (lack of remorse supported finding that employee did not exhibit potential for rehabilitation); *Wallace v. Dep't of Health & Human Servs.*, 89 M.S.P.R. 178, ¶ 18 (2001) (upholding finding that there was little potential for rehabilitation where the employee "was defiant, showed no remorse, and refused to acknowledge that what she did was wrong").

### III.

¶ 35. We return to the main issue in this appeal — whether the Board improperly substituted its own judgment for that of the State when it concluded that the State's dismissal was not reasonable under the circumstances. As explained, the Board's decision was based on its assessment that: (1) DOC's dismissal of grievant was overly harsh given its decision not to discipline Miller, (2) DOC's lack of an effective razor blade policy contributed to grievant's misconduct, and (3) grievant had the potential for rehabilitation. We have concluded that the first two factors were not relevant and that the third was not supported by the evidence. Without these mitigating factors, we are left with the Board's own assessment that grievant committed serious misconduct, grievant's offenses had an adverse impact on his ability to perform his job, and grievant's conduct was significant enough to warrant bypassing progressive discipline. On this record, we conclude that the State's decision to dismiss grievant was reasonable as a matter of law. Thus, while the Board may have in the first instance imposed a different sanction than dismissal, it lacked authority to override the State's decision to dismiss grievant. We therefore vacate the Board's decision and reinstate grievant's

dismissal. See *In re Carlson*, 140 Vt. at 560, 442 A.2d at 60 (vacating board's decision as erroneous as a matter of law and reinstating employer's dismissal); *In re Gage*, 137 Vt. at 20, 398 A.2d at 299 (concluding that under supported facts, just cause existed as a matter of law).

*Reversed; the order of the Vermont Labor Relations Board is vacated, and the dismissal is reinstated.*