NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 12

No. 2019-127

| | |
|---|---|
| In re Grievance of Jacob Carnelli | Supreme Court |
| | On Appeal from Labor Relations Board |
| | September Term, 2019 |

Richard W. Park, Chair

Thomas J. Donovan, Jr., Attorney General, and Alison L.T. Powers, Assistant Attorney General, Montpelier, for Appellant State.

Timothy Belcher, General Counsel, Vermont State Employees' Association, Montpelier, for Appellee.


PRESENT: Reiber, C.J., Robinson, Eaton and Carroll, JJ., and Morris, Supr. J. (Ret.), Specially Assigned


¶ 1. **ROBINSON, J.** The State appeals a decision by the Labor Relations Board that grievant, a former correctional officer who was eligible for mandatory reemployment pursuant to the applicable collective bargaining agreement (CBA), met the minimum qualifications for a position at the Department of Motor Vehicles requiring at least two years of "office clerical experience." We conclude that the Board overstepped its authority by failing to apply the minimum qualifications as established by the DMV, and therefore reverse.

¶ 2. The CBA at issue in this case provides that employees eligible for mandatory reemployment rights (sometimes called "RIF" rights) are entitled to an offer for any vacant classified bargaining unit position when management intends to fill it, provided, among other things, that the employee "meets the minimum qualifications for the position." The definition of

"minimum qualifications" in the CBA is "the lowest level of skills, experience and educational qualifications necessary for admittance to the examination process." Consistent with this definition, the state policy relating to recruitment and posting of vacancies defines "minimum qualifications" as "criteria established for the initial screening of job applicants." Vt. Dep't of Human Res., Personnel Policy and Procedure Manual 4.0 (Sep. 13, 2015), https://humanresources. vermont.gov/sites/humanresources/files/documents/Labor_Relations_Policy_EEO/Policy_Proce dure_Manual/Number_4.0_RECRUITMENT_AND_POSTING_OF_VACANCIES.pdf [https:// perma.cc/K3L3-FLY6] ("Personnel Policy 4.0"). The definition in Personnel Policy 4.0 further states:

> Minimum qualifications are usually expressed in terms of the nature and amount of formal education, training, work experience, as well as any special requirements such as licenses, certifications, or physical standards. Minimum qualifications are set at a level that provides a reasonable likelihood that a candidate for the job possesses the most important minimum required knowledge, skills, and abilities to adequately perform entry level work in the job.

¶ 3.    To effectuate these contractual reemployment rights, the Personnel Policies provide that before a position is made available for the competitive application process, it must be "RIF-cleared," a process in which the Department of Human Resources (DHR) screens the position to determine whether anyone with reemployment rights meets the minimum qualifications for the position. If so, DHR will make a "mandatory referral," and the department hiring manager has no discretion to decline to offer the position to the candidate.

¶ 4.    The Vermont State Employees' Association (VSEA) filed this grievance on May 8, 2018, alleging that when the State filled an open position for Motor Vehicle Customer Service Specialist with the DMV, it denied grievant his right to reemployment under the CBA. After an evidentiary hearing, the Labor Relations Board found the following facts.

¶ 5.    Grievant attended a four-year university as a full-time student from September 2006 to May 2010, receiving a Bachelor of Science degree in Sociology, with a focus on criminal justice. During that time, from May 2007 to August 2007, he worked as an office assistant in the university

2

financial aid office, organizing student financial aid reports and records, mailing financial aid awards and records, and helping students at the front office with concerns or questions. He worked as an assistant in the information technology department from September 2009 to August 2010, greeting guests, answering phones, faxing and copying documents, scheduling conferences and trainings for staff using the computer, and transporting mail.

¶ 6. Grievant worked as a correctional officer for the Vermont Department of Corrections starting in December 2010. He was assigned to living units and as a float officer. In March 2016, he suffered a non-work-related injury and could no longer work as a correctional officer. Beginning in October 2017, he qualified for a "medical reduction in force" and was therefore entitled to mandatory reemployment rights under the CBA. He took all contractually required steps to invoke his RIF rights, including meeting with a human resources coordinator at DHR to set the parameters of positions he would accept and provide information on his educational and work background.

¶ 7. The Department of Human Resources RIF-cleared the DMV position at issue here before posting it publicly in January 2018. The minimum education and experience qualifications for this position were:

> High school graduation or equivalent AND two (2) years or more of office clerical experience, that included significant public contact.
>
> OR
>
> Completion of a one-year vocational/technical training program in business and office occupations or related area AND one (1) year or more of office clerical experience that included significant public contact.

Believing that he met the first standard of high school graduation and two years of office clerical experience that included significant public contact, grievant emailed the DHR coordinator to ask why he had not been referred to the position, and indicated that he believed he met the necessary qualifications. She replied that although he may have "some incidental clerical experience," he did not have two years of "office clerical experience." After several emails back and forth, she

3

stopped responding. Several months later, the union filed this grievance challenging DHR's decision.

¶ 8. In assessing whether grievant met the minimum qualifications for the DMV position, the Board noted that it was undisputed that he met the educational (high school) requirement and that he had fifteen months of pertinent clerical experience based on his jobs while in college. The disputed issue, as described by the Board, was whether grievant should be "credited with at least nine months of pertinent clerical experience for the five plus years he served as a correctional officer."[1]

¶ 9. In evaluating this question, the Board reviewed the job responsibilities of a correctional officer. It found that correctional officers routinely perform head counts of inmates, conduct security checks, inspect inmates' cells, supervise inmates' meals and visitations, conduct perimeter checks, and transport inmates outside of the correctional facility. The Board noted, "Many of these security functions are documented with a written report or some other paperwork as a record of the activity." The Board found that grievant had access to a desk, telephone, and computer, and that he had been responsible for communicating via phone and email, scheduling meetings, logging information, and managing mail. It found that grievant had performed these duties "for the equivalent of at least nine months during his tenure as a correctional officer." In concluding otherwise, the Board found, the State had taken "an unduly narrow view of applicable clerical experience in the modern workplace." The Board explained that the State was required to "examine grievant's tasks as a correctional officer and weigh his experience in meeting the competencies of the Motor Vehicle Customer Service Specialist position." Although that position had already been filled and grievant had accepted another position at Vermont Psychiatric

---

[1] The Board rejected the argument that grievant qualified on the alternative basis of one year of vocational training and one year or more of office clerical experience, concluding "it is too far of a stretch to hold that his Bachelor degree in Sociology was tantamount to completion of a 'vocational/technical training program in business and office occupations or related area.' "

4

Hospital, the Board ordered the State to offer grievant the next available vacancy, and to provide him with back pay and any benefits he lost as a result of not being selected.[2]

¶ 10. The State appeals, arguing that the Board abused its discretion in finding that grievant met the minimum qualifications for the DMV position. Specifically, it argues that the Board impermissibly broadened the contractual definition of minimum qualifications, failed to defer to the State in its interpretation of the minimum qualifications, and engaged in an analysis of grievant's competencies that was not bargained for in the CBA. The State also argues that the Board's findings as to grievant's experience as a correctional officer did not support its conclusion that he met the minimum qualifications for the DMV position.

¶ 11. We agree that the Board failed to defer to the State's authority to establish minimum qualifications for RIF-eligible positions and instead essentially substituted alternative minimum qualifications, focusing on the cumulative time grievant spent performing clerical tasks during his tenure as a correctional officer rather than whether grievant had the requisite experience working in an "office clerical" position. Our conclusion flows from a consideration of the applicable standard of review as well as the specific minimum qualifications for the DMV position.

I. Standard of Review

¶ 12. Although we are generally deferential in our review of Labor Relations Board decisions, we owe no deference when the Board exceeds its authority. Because this limitation on our deference to the Board shapes our analysis in this case, we explain it in further detail.

¶ 13. Generally, our review of the Board's reasonable construction of a CBA is deferential. "On appeal from the Board's decision, we defer to the Board's construction of the collective bargaining agreement, given the Board's expertise in that area." In re Jewett, 2009 VT 67, ¶ 25, 186 Vt. 160, 978 A.2d 470. Accordingly, to the extent that the Board's analysis in this

---

[2] When a position became available, grievant declined it, deciding to remain in his position at the Vermont Psychiatric Hospital. In a subsequent decision, the Board determined that the State had completed the remedial action required by the Board's initial order with respect to placing grievant in a position pursuant to his RIF rights, but that grievant remained entitled to back pay.

case hinges on its understanding of the CBA's requirements, we owe deference if its interpretation is reasonable. We likewise defer to the Board's factual findings, and will not set them aside unless they are clearly erroneous. Id.

¶ 14. We conclude, however, that establishing minimum qualifications for classified positions is one area in which "the Board does not have authority to substitute its own judgment for that of the State." Id. ¶ 24. This limitation on the Board's authority is grounded in statute, and supported by established policy considerations.

¶ 15. The relevant statute is 3 V.S.A. § 310(b), which, as construed by this Court, expressly delegates to the relevant State agency the power to establish minimum qualifications for jobs. Section 310(b) states in part, "It shall be the responsibility of the head of each department to provide current job descriptions for all positions within [the] department . . . ." We have held that under this provision, DHR (then the Department of Personnel) may not "reject, edit or dispute the job descriptions" created by department heads. In re D'Orazio, 139 Vt. 423, 426, 429 A.2d 1307, 1309 (1981). Relying on this decision, the Board has likewise recognized that department heads have "exclusive authority to create job descriptions, including establishing minimum qualifications for positions." Labor Relations Board: Vt. State Emps.' Ass'n v. Agency of Human Servs., No. 08-17, 30 VLRB 296, 331, 2009 WL 4808835, *23 (Nov. 13, 2009).

¶ 16. It follows that the Board also may not disregard or edit minimum qualifications, provided that those qualifications were set in accordance with the applicable law and CBA. We recognize that these cases, and the underlying statute, speak more to a division of roles between DHR and the agencies ultimately hiring classified employees, but § 310(b)'s express assignment of authority to department heads, and our emphasis on the agency's primacy in defining minimum qualifications, suggest that decisions made pursuant to this authority are not subject to second-guessing by the Board. The State's power is not unlimited—department heads may only set minimum requirements that fit within the DHR policy definition of "education, experience and skills required for entry into a position." Vt. State Emps.' Ass'n, 30 VLRB 296, 331, 2009 WL

4808835, *23. Department heads cannot defy statutory limitations or run afoul of protections in the CBA. However, provided the minimum qualifications fall within these bounds, neither DHR nor the Board itself may disregard them.

¶ 17. Moreover, the establishment of minimum qualifications for a job is the type of inherent management prerogative we have recognized in requiring the Board to defer to other management decisions by the State. In a grievance proceeding arising from the State's dismissal of an employee, we explained that "the Board's role is limited to determining whether the State met its burden of demonstrating by a preponderance of the evidence that there was just cause for dismissal." Jewett, 2009 Vt. 67, ¶ 23. We stated that this Court "must ensure that the Board has not overstepped its authority by substituting its own judgment for that of the State." Id. ¶ 25. We explained that "as long as the exercise of its management function is 'reasonable,' the State's decision must be sustained" because "controlling and directing the work force 'is an inherent management function.' " In re Grievance of Lepore, 2016 VT 129, ¶ 17, 204 Vt. 33, 161 A.3d 1219 (quoting Jewett, 2009 VT 67, ¶ 24). The establishment of minimum qualifications for a classified position is likewise an inherent management prerogative. In fact, because employees with RIF rights who meet the minimum qualifications for a position must be offered the job, the establishment of minimum job qualifications is department heads' only tool for ensuring qualified hires. For these reasons, when the State acts within reason in establishing minimum qualifications, and is otherwise in compliance with its obligations under the CBA, the Board, and this Court, may not rewrite or disregard them.

¶ 18. To the extent that the Board's analysis hinges on its interpretation of the minimum qualifications established by the State, we are charged with ensuring that it did not overstep its authority.

## II. Minimum Qualifications for DMV Position

¶ 19. The central question in this appeal is not, as VSEA suggests, the meaning of "minimum qualifications" in the CBA; it is whether grievant met the minimum qualifications for

7

the DMV position. Consistent with the above, we owe the Board deference with respect to its findings of fact concerning grievant's relevant education and experience. But regarding the "minimum qualifications" for the DMV position, the Board owes deference to, and is not free to stray from, the definition established by the DMV. We will not defer to "factual" findings that effectively rewrite the minimum qualifications for the job.

¶ 20.   We conclude that the Board overstepped its authority here by essentially redefining the minimum qualifications for the DMV position. Rather than applying the clear meaning of the term, the Board applied a skills-based analysis, reinterpreting the minimum qualifications to include the equivalent of office clerical work, for the equivalent of two years. In so doing, the Board departed from the minimum qualifications as defined by the DMV. Our conclusion is consistent with both the CBA and DHR policy. Neither our case law calling for a functional analysis of job duties in other contexts nor the fact that some individuals who do not meet the minimum requirements have been hired through the competitive hiring process persuades us otherwise. We discuss these considerations in more detail below.

¶ 21.   As noted above, the minimum qualifications for the DMV position include, in relevant part, "two (2) years or more of office clerical experience, that included significant public contact." Consistent with a straightforward understanding of this requirement, a recruitment services supervisor at DHR testified at the Board hearing that the meaning of "office clerical experience" was "office clerical as an occupation." In other words, "that's the primary focus of the position, . . . that's the reason for the job to exist, is to perform those—to be an office clerk." The main function of a correctional officer, in her view, was to "provide safety and security within the . . . facility," and that clerical duties, important as they may be, are "incidental to the main activities of that position." She testified, "I don't have the latitude to say, I don't think they meet the minimum qualifications but I could tell that they could do it, so I'm going to make the referral." And she rejected the notion that she could conclude that someone has two years of office clerical

8

experience by adding up all the time a person performs clerical tasks in the course of their otherwise non-clerical job.

¶ 22.   In concluding that grievant had more than two years of office clerical experience because the time he spent performing clerical tasks in the course of his work as a corrections officer added up to more than nine months, the Board described the State's understanding of clerical work to be "an outdated application of clerical work in our technological age."  It did not, however, find as a matter of fact that correctional officers are clerical workers or that their primary occupation was administrative—and the record does not appear to support such a finding.  Instead, it found that "grievant had experience as a correctional officer performing most of the clerical tasks credited as important by the State," and that this experience furthered his ability to meet the requirements of the DMV position.  It also found that "the frequency with which he performed such tasks was equivalent to at least nine months of the five plus years he was a correctional officer."

¶ 23.   The Board first overstepped its authority when it evaluated grievant's qualifications by "weighing whether the applicable experience furthers an applicant's ability to meet the competencies of the position."  It did not ask whether grievant's job as a correctional officer was an "office clerical" position, but instead reasoned that it provided him the same skills that office clerical experience would.  It admonished the State for emphasizing the "setting in which clerical work occurs rather than the tasks performed."  In doing so, the Board essentially disregarded the word "office" in "office clerical experience," suggesting that any work involving clerical tasks qualifies as "office clerical" work.  It also implicitly rejected the notion that clerical and administrative professionals develop distinct or more robust skills relative to workers in other settings whose jobs require them to complete reports, use office equipment, or use a computer for administrative purposes.  The Board is not authorized to reinterpret the minimum qualifications in this way.  The Board may well believe that the minimum qualifications set by the State are outdated, but it is not the Board's role to modernize the State's job descriptions.  It may not "substitut[e] its own judgment for that of the State."  Jewett, 2009 VT 67, ¶ 25.

¶ 24. Second, the Board overstepped when it credited grievant with nine months of clerical work based on the amount of time he spent performing clerical tasks. It stated that "the frequency with which he performed such tasks was equivalent to at least nine months of the five plus years he was a correctional officer." This unorthodox method of calculating work experience is not called for by the job descriptions set by the State. The State did not include the words "or equivalent," or any similar language, in its job description. Thus, the Board was not empowered to ask whether grievant had the cumulative equivalent of two years of office clerical experience, but was only empowered to decide whether he had two years of office clerical experience. It must apply the minimum requirements as established by the State.

¶ 25. The CBA reinforces this conclusion. The CBA defines minimum qualifications as "the lowest level of skills, experience and educational qualifications necessary for admittance to the examination process." The CBA itself recognizes that "skills," "experience," and "educational qualifications" are distinct aspects of "minimum qualifications"—people who can demonstrate the requisite skills but lack the required experience and education do not meet "minimum qualifications" as defined by the CBA even though they may well be able to perform a particular job. Moreover, the CBA extends RIF rights to employees who meet "the minimum qualifications for the position"—not "the minimum qualifications for the position or the functional equivalent." The Board's approach effectively expands the rights of bargaining-unit members beyond those bargained for in the CBA. Milton Bd. of Sch. Dirs. v. Milton Staff Ass'n, Local 130 VEA/NEA, 163 Vt. 240, 244, 656 A.2d 993, 995 (1995) ("We will not supply terms or embrace a construction that would alter the rights of the parties as expressed in the original agreement.").

¶ 26. State personnel policies likewise support our analysis. DHR defines minimum qualifications as being "set at a level that provides a reasonable likelihood that a candidate for the job possesses the most important minimum required knowledge, skills, and abilities to adequately perform entry level work in the job." Personnel Policy 4.0. This policy recognizes that the "minimum qualifications" screen identifies candidates who are most likely to have the requisite

10

competencies. Pursuant to DHR policy, the "education" and "experience" requirements in particular serve this purpose. See id. ("Minimum qualifications are usually expressed in terms of the nature and amount of formal education, training, work experience, as well as any special requirements such as licenses, certifications, or physical standards."). Nothing in these policies authorizes DHR, or the Board, to override the plain meaning of a minimum qualification, or to substitute a skills-based analysis for the minimum work-experience requirements.

¶ 27. We conclude that the cases relied upon by VSEA in support of the Board's tally of the clerical tasks performed by grievant in his capacity as a corrections officer are inapposite. The cases involve different contexts that call for a functional analysis of an employee's job responsibilities rather than the categorical application of "minimum qualification" requirements as required by the CBA in this case. See, e.g., Harwood Union High Sch. Dist. v. Harwood Educ. Ass'n, 172 Vt. 167, 175, 773 A.2d 277, 284 (2001) (stating that to determine whether employees are confidential employees and thus excluded from bargaining unit, "the relevant consideration is the employees' actual powers, rather than their theoretical authority" (quotation omitted)); Fighterfighters of Brattleboro, Vt., Local #2628 v. Brattleboro Fire Dep't, 138 Vt. 347, 351, 1415 A.2d 243, 245 (1980) (stating that in determining whether individual is supervisor and thus statutorily excluded from bargaining unit, "theoretical or paper power will not make one a supervisor"). In this context, the CBA does not provide mandatory reemployment rights to every applicant whose transferable skills from past employment render them competent to perform a given job. Nor does it allow substitution of work experience involving similar transferable skills for the work experience required to meet the minimum qualifications of a particular job. Instead, it guarantees mandatory reemployment rights to every applicant who meets the minimum qualifications for the job.

¶ 28. Finally, the fact that hiring managers have made exceptions to the minimum qualifications in the competitive hiring process does not change our conclusion. In support of its interpretation of the minimum qualifications, the Board pointed to evidence that, in its competitive

11

hiring process (as opposed to the RIF process), DMV has hired at least one applicant with "significantly less office clerical experience listed on the employment application than Grievant." Minimum qualifications cannot be used selectively to screen out candidates with reemployment rights. For this reason, the Board was correct to disregard the skills listed in the job specifications for the DMV position, such as "considerable knowledge of motor vehicle financing," which are not treated as minimum qualifications for any applicant. However, we cannot conclude that a minimum qualification may not be applied by DHR simply because in the distinct competitive hiring process the department hiring manager has sometimes made exceptions to the department's own minimum qualifications. This does not appear to be a case where minimum qualifications are being used as an "end-run" around the State's contractual obligations.[3] Vt. State Emps.' Ass'n, 30 VLRB 296, 331, 2009 WL 4808835, *23.

¶ 29.    In sum, it is not the Board's role to rewrite job descriptions or to require a different analysis than was anticipated in the CBA. Because we conclude that the Board departed from a straightforward application of the DMV's established minimum qualifications in this case, we reverse.

Reversed.

FOR THE COURT:

_____

Associate Justice

---

[3]    Likewise, the fact that the DHR recruiter provided grievant a list of tasks or skills routinely performed by individuals performing full-time office clerical work does not mean that a corrections officer who performs many of those tasks in the course of supervising and transporting inmates is therefore in an office clerical position.